**UNCLE B'S BAKERY, INC., Plaintiff,**

v.

**Kevin O'ROURKE and Brooklyn Bagel Boys, Inc., Defendants.**

**No. C 96–3016–MWB.**

United States District Court,
N.D. Iowa,
Central Division.

Sept. 18, 1996.

Dennis W. Johnson of Dorsey & Whitney, P.L.L.P., Des Moines, IA, for Plaintiff Uncle B's Bakery, Inc.

Michael P. Jacobs of Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser, Sioux City, IA, for Defendant Kevin O'Rourke.

Richard H. Moeller of Berenstein, Moore, Moser, Berenstein & Heffernan, Sioux City, IA, for Defendant Brooklyn Bagel Boys, Inc., but took no part in the proceedings.

MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT O'ROURKE'S MOTION TO MODIFY PRELIMINARY INJUNCTION

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................. 1452
II. FINDINGS OF FACT ........................................... 1455
III. LEGAL ANALYSIS ............................................ 1459
    A. Standards For Vacation Or Modification Of A Preliminary Injunction........ 1459
    B. Vacation Or Modification Here ................................... 1459
        1. Direct or indirect competition............................... 1459
        2. "Hardship" or "oppression" .............................. 1461
    C. Clarification ............................................. 1464
    D. Modification ............................................. 1464
IV. CONCLUSION................................................. 1465

On April 1, 1996, this court granted the application for a preliminary injunction of a maker and distributor of supermarket bagels seeking to protect its "trade secrets" in bagel making and packaging by enjoining a former employee from disclosing those secrets to, or working for, a competitor. *See Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405 (N.D.Iowa 1996). The portion of the preliminary injunction enjoining the former employee's employment with a competitor, also a defendant, was stayed for the period of thirty days to allow the former employee a reasonable opportunity to obtain alternative employment. When the former employee's employment with the other named defendant ended on April 30, 1996, pursuant to the terms of the preliminary injunction, he had not yet found other employment. Now, several months later, after the plaintiff rejected his employment with one company the plaintiff perceived to be a competitor, the former employee, "in an over-abundance of caution," seeks a modification of the preliminary injunction that will allow him to accept an employment offer with a company he asserts does not compete, either directly or indirectly, with the plaintiff, although it is in a different slice of the bagel business. In its April 1, 1996, ruling, the court found that equity required the issuance of the preliminary injunction in this case. The question now before the court is whether equity also requires a modification of the preliminary injunction in light of subsequent developments.

## I. INTRODUCTION

Because the parties, and particularly the defendant seeking a modification of the preliminary injunction in this case, require a prompt answer to the query before the court, the court needs must be brief in its statement of the background to the present request for modification of a preliminary injunction. Plaintiff Uncle B's Bakery, Inc., filed its complaint in this matter on February 6, 1996, against defendant Kevin O'Rourke, the former manager of Uncle B's Bakery's Ellsworth, Iowa, plant, and defendant Brooklyn Bagel Boys, Inc., O'Rourke's then-current employer and, according to Uncle B's Bakery's complaint, one of Uncle B's Bakery's direct competitors. The complaint was in eight counts, but its principal concerns were fears of disclosure of Uncle B's Bakery's trade secrets and violation of a noncompetition agreement supposedly signed by defendant O'Rourke.[1] On the same day the

---

1. Specifically, Count I of the complaint alleges O'Rourke's breach of a confidentiality agreement by using or disclosing to others, without authorization of Uncle B's Bakery, information relating to the production or packaging of food products manufactured and distributed by Uncle B's Bakery. As relief, this count seeks a preliminary and permanent injunction restraining O'Rourke from

complaint was filed, Uncle B's Bakery also filed a motion for a preliminary injunction seeking to enjoin O'Rourke's violation of the non-competition agreement and the defendants' misappropriation of Uncle B's Bakery's trade secrets.[2] After an evidentiary hearing on March 25 and 26, 1996, the court

entered a preliminary injunction on April 1, 1996, which, *inter alia*, enjoined defendant Kevin O'Rourke from disclosing trade secrets or confidential information of Uncle B's Bakery and further enjoined O'Rourke's employment with a direct or indirect competitor of Uncle B's Bakery.[3] On September 4, 1996,

using or disclosing confidential information or trade secrets in violation of the confidentiality agreement with Uncle B's Bakery, damages, attorneys fees, and costs. Count II alleges breach of a non-competition clause in an employment agreement allegedly signed by O'Rourke when he entered into his employment with Uncle B's Bakery. As relief, this count seeks a preliminary and permanent injunction restraining O'Rourke from accepting or continuing employment with any competitor of Uncle B's Bakery, liquidated damages as specified in the contract of employment in which the non-competition clause is contained, punitive damages, attorneys fees and costs, and such other relief as the court deems proper. Count III alleges intentional interference by Brooklyn Bagel Boys with the contractual relationship between O'Rourke and Uncle B's Bakery. As relief on this claim, Uncle B's Bakery seeks actual and punitive damages and such other relief as the court deems just and proper. Count IV alleges that Brooklyn Bagel Boys intentionally interfered with a prospective business advantage of Uncle B's Bakery. This claim seeks as relief actual and punitive damages, costs, and such other relief as the court deems just and proper. Count V alleges both defendants have made an actual or threatened misappropriation of Uncle B's Bakery's trade secrets in violation of Iowa Code Ch. 550, the Iowa Uniform Trade Secrets Act. It seeks relief in the form of a preliminary and permanent injunction preventing such misappropriation or threatened misappropriation of trade secrets and requiring affirmative acts, not specified, to protect Uncle B's Bakery's trade secrets, actual and punitive damages, attorneys fees and costs, and such other relief as the court deems just and proper. Count VI alleges O'Rourke's breach of a fiduciary duty to maintain the confidentiality of Uncle B's Bakery's trade secrets, and seeks actual and punitive damages and plaintiff's costs as relief, as well as such other relief as the court deems just and proper. Count VII alleges that O'Rourke fraudulently misrepresented his intention to work for a competitor of Uncle B's Bakery with intent to deceive Uncle B's Bakery, thus causing a delay in Uncle B's Bakery's efforts to protect its trade secrets. This count also seeks actual and punitive damages, costs, and such other relief as the court deems just and proper. The final count of the complaint, Count VIII, is an alternative to Count VII, alleging negligent misrepresentation. It also seeks actual and punitive damages, costs, and such other relief as the court deems just and proper.

2. Thus, Uncle B's Bakery's motion for a preliminary injunction is the companion motion to the prayers for preliminary and permanent injunctions made in Counts I, II, and V of the complaint.

3. The terms of the preliminary injunction were as follows:

WHEREAS, pursuant to *Fed.R.Civ.P.* 65(b), the court finds that there is a threat of disclosure of trade secrets and confidential information of plaintiff Uncle B's Bakery, Inc., and an actual or threatened violation of a non-competition agreement between Uncle B's Bakery and defendant Kevin O'Rourke, each of which poses a threat of irreparable harm to plaintiff Uncle B's Bakery, Inc., and whereas, in light of all of the circumstances known to the court and upon a balance of the equities, the court concludes that a preliminary injunction should issue, defendants **Kevin O'Rourke** and **Brooklyn Bagel Boys, Inc.,** are **hereby enjoined** as follows:

1. **Defendant Kevin O'Rourke is hereby enjoined** from disclosing any and all of Uncle B's Bakery's past, present, or future raw or processed products, ingredients, formulas, original and unique recipes, manufacturing, advertising or design techniques, plans, ideas, equipment brands and types, processes, methods, and operating conditions, including packaging techniques or processes, not previously publicly known, and such other information as Uncle B's Bakery has sought to maintain as confidential during Mr. O'Rourke's employment with Uncle B's Bakery. **Defendant Brooklyn Bagel Boys is hereby enjoined** from appropriating or obtaining or seeking to appropriate or obtain any of the above-listed information from Kevin O'Rourke, or utilizing in any way such information previously obtained from Kevin O'Rourke.

2. **Defendant Kevin O'Rourke is hereby enjoined** from competing directly or indirectly, or having an interest in any business, corporation or other entity which competes directly or indirectly, or working for any person, business, corporation or other entity which competes directly or indirectly with Uncle B's Bakery, including defendant Brooklyn Bagel Boys, within a 500 mile radius of any of Uncle B's Bakery's marketing outlets during the pendency of this preliminary injunction. This paragraph of this preliminary injunction is stayed for the period of thirty days from the date of this order, in order to allow Kevin O'Rourke a reasonable opportunity to obtain alternative employment, although during that thirty-day period, the defendants shall remain subject to all other terms of this preliminary injunction.

3. This preliminary injunction shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order.

O'Rourke moved to modify that preliminary injunction to allow him to accept employment with a company named The Grain Baker's Bakery, Inc., which is a start-up company that will be producing and shipping frozen, never cooked bagels to specific retail outlets for sale by in-store bakeries.

The court held a preliminary telephone conference with counsel for the parties on September 10, 1996, and set an evidentiary hearing on O'Rourke's motion to modify the preliminary injunction for September 17, 1996, in Sioux City, Iowa. On September 16, 1996, the day prior to the hearing, Uncle B's Bakery filed a resistance to O'Rourke's application to modify the preliminary injunction. At the hearing on September 17, 1996, plaintiff Uncle B's Bakery, Inc., was represented by counsel Dennis W. Johnson of Dorsey & Whitney, P.L.L.P., in Des Moines, Iowa. Defendant Kevin O'Rourke was represented by counsel Michael P. Jacobs of Rawlings, Nieland, Probasco, Killinger, Ellwanger, Jacobs & Mohrhauser in Sioux City, Iowa.[4] Richard H. Moeller of Berenstein, Moore, Moser, Berenstein & Heffernan in Sioux City, Iowa, appeared as counsel for defendant Brooklyn Bagel Boys, Inc., to advise the court that a confidential settlement had been reached between Uncle B's Bakery and Brooklyn Bagel Boys, and therefore Brooklyn Bagel Boys would not be participating further in the proceedings.

At the hearing, O'Rourke presented the testimony of H. Thomas Dunck, a representative of the company from which O'Rourke has received an offer of employment, O'Rourke himself, and William Rose, Jr., Uncle B's Bakery's CEO. O'Rourke also submitted exhibits in the form of Uncle B's Bakery's answers to certain interrogatories and other discovery requests, a recent newspaper article concerning Uncle B's Bakery's business, and the affidavit of O'Rourke detailing his efforts to find employment since his forced departure from his job at Brooklyn Bagel Boys. Uncle B's Bakery presented further testimony of Mr. Rose. The hearing was recessed briefly while the parties attempted to negotiate a settlement, but, upon the failure of such negotiations, was resumed. The court was impressed by the efforts of counsel and the parties to dispose of this matter fairly and reasonably, and the need for the court's intervention is therefore not for lack of effort on the part of the litigants. The court was also impressed with the evident care in the preparation of the parties' presentations in light of the short time between the filing of the motion for modification and the hearing, and with the conscientiousness, professionalism, and courtesy of counsel for both Uncle B's Bakery and O'Rourke in representing their parties' respective positions. The motion for modification of the preliminary injunction is now fully submitted, and the court must decide the merits of O'Rourke's request.

In support of his motion to modify or vacate the preliminary injunction in this case, O'Rourke asserts first that Uncle B's Bakery presented no evidence to show that he has disclosed any trade secrets or proprietary information or in any way harmed Uncle B's Bakery's competitive position in the bagel market. This lack of evidence, O'Rourke contends, should be balanced against the extreme financial hardship he has endured since the termination of his employment with Brooklyn Bagel Boys. O'Rourke also points to evidence that Uncle B's Bakery has redirected a significant share of its business into producing bagels for a food service company, which is a direction Uncle B's Bakery never contemplated or pursued while he was working for it, nor is it one his potential employer intends to pursue. Therefore, O'Rourke argues that with Uncle B's Bakery's new direction and the fact that his potential employer will not compete in bread aisle or refrigerated case portions of the supermarket bagel industry, if Uncle B's Bakery ultimately prevails on the merits of its claim, the court will be able to fashion an appropriate remedy to prevent any harm to Uncle B's Bakery. O'Rourke also contends that no

---

4. This preliminary injunction shall issue upon the giving of security of One Hundred Thousand Dollars ($100,000) by applicant Uncle B's Bakery.

5. This preliminary injunction shall remain in full force and effect until further order of this court.

Preliminary Injunction, April 1, 1996.

4. O'Rourke had originally been represented by counsel for Brooklyn Bagel Boys, but is now represented by separate counsel.

harm will occur in the interim, because The Grain Baker's Bakery is not yet ready to go into production. O'Rourke also cites Iowa decisions in which the court declined to grant injunctive relief to enforce provisions of a non-competition agreement, because of the oppressiveness or hardships such injunctive relief would impose upon the former employee.

In its resistance to modification, Uncle B's Bakery asserts that O'Rourke must, but cannot, establish a change in circumstances that makes the original preliminary injunction inequitable, citing *Favia v. Indiana Univ. of Penn.*, 7 F.3d 332, 340 (3d Cir. 1993). Uncle B's Bakery asserts that requirement means O'Rourke must establish *unforeseen* hardship resulting from enforcement of the covenant not to compete. Uncle B's Bakery contends that the same reasons to fear disclosure of its confidential information and to fear competition from an indirect or direct competitor obtain if O'Rourke is employed by The Grain Baker's Bakery as existed when he was employed by Brooklyn Bagel Boys. Specifically, Uncle B's Bakery asserts that The Grain Baker's Bakery's bagels will ultimately compete in the same supermarket bagel market as Uncle B's Bakery's present products. Uncle B's Bakery also asserts that the production and packaging technology and secrets it is seeking to protect are not necessarily inapplicable to The Grain Baker's Bakery's production plans, noting further that The Grain Baker's Bakery's plans are only preliminary. Thus, The Grain Baker's Bakery could decide to take a turn into areas Uncle B's Bakery specifically seeks to protect when The Grain Baker's Bakery has access to O'Rourke's fund of information. Uncle B's Bakery asserts that the court has already done a balance of harms that is in no way altered by O'Rourke's assertions of actual financial hardship.

## II. FINDINGS OF FACT

Any findings of fact here or in the subsequent legal analysis, as well as any conclusions of law forming part of the court's determination of whether to modify the preliminary injunction already issued in this case, are intended to be subject to the "general rule" that " 'the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.' " *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir.1995) (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981)). The court believes this "general rule" to be no less applicable to modification proceedings than to the original preliminary injunction proceedings, because the court still is not operating on a complete record after full-fledged trial on the merits, however detailed the evidentiary record on modification might be. Furthermore, because the modification issue is relatively narrow, as compared to even the original preliminary injunction determination, it would be improper to suggest that the findings of fact from the modification proceedings, which could have an unexpected impact on later proceedings when the entire range of issues is once again at play, should be considered as anything but preliminary.

O'Rourke testified that since the termination of his employment with Brooklyn Bagel Boys, he has devoted all of his time, energy, effort, skill, and resources to finding alternative employment, but that he has been without employment since April. O'Rourke has contacted some seventy-five prospective employers or likely contacts. Because he has not been able to find a job, O'Rourke testified that he and his family are suffering grave financial hardships. Although O'Rourke has not been employed since the end of April, and has not been paid for working since April, he has received a severance payment from Brooklyn Bagel Boys, and, when he did not find other employment, received payments from Brooklyn Bagel Boys roughly equivalent to his prior paychecks for four two-week pay periods in May and June. In addition, O'Rourke has some savings left, although his savings have been substantially depleted. O'Rourke is also entitled to certain benefits from a 401k retirement plan. However, O'Rourke testified that the bank that is supposed to receive the rollover from that account has not been able

to find it, and, in any event, there would be a substantial penalty on any withdrawals from those retirement savings. O'Rourke's wife continues to be employed outside the home, but her income was and is significantly less than O'Rourke's was while he was employed with Brooklyn Bagel Boys. Against these modest financial credits, O'Rourke has incurred significant new debts in the form of loans against the equity in his house, which he has been unable to sell despite listing it on the market, and charges to credit cards for the purchase of necessary items.

Turning from O'Rourke's financial difficulties to the products of his job search, the court finds that during the summer of 1996, O'Rourke received a job offer from Harlan Bakeries in Indianapolis, Indiana. Harlan Bakeries was preparing to start production in a new facility that would produce frozen bagels for one particular nationwide retail chain. According to O'Rourke's testimony, Harlan Bakeries' bagels were to be produced pursuant to its customer's recipes, procedures, and specifications. Furthermore, Harlan Bakeries' production facility had already been designed, constructed, and tooled, and was therefore ready to go into production. According to O'Rourke's understanding, Harlan Bakeries would not be producing bagels for the supermarket bagel market, nor would it be using any of the packaging techniques at issue in the preliminary injunction proceedings as relevant to Uncle B's Bakery's trade secrets. O'Rourke testified that, through his attorney, he contacted Uncle B's Bakery seeking a consensual modification of the preliminary injunction in this case to allow him to accept the position with Harlan Bakeries. However, Uncle B's Bakery refused to consent to any modification of the preliminary injunction and O'Rourke did

not seek intervention of the court. O'Rourke testified, and the court accepts as true, that once Uncle B's Bakery refused to consent to O'Rourke's employment with Harlan Bakeries, Harlan's interest in employing O'Rourke, or seeking a modification of the preliminary injunction to allow him to do so, flagged.

The reason for Uncle B's Bakery's rejection of O'Rourke's employment with Harlan Bakeries was that Harlan Bakeries does make supermarket bagels at other facilities in addition to the bagels it was to make for a specific retail chain at the facility where O'Rourke was offered employment. Furthermore, according to the undisputed testimony of William Rose, Jr., Harlan had announced its intention to compete head-on with Uncle B's Bakery in the supermarket bagel market and had succeeded in displacing Uncle B's Bakery from one regional grocery store's chain of stores. Thus, Uncle B's Bakery correctly perceived Harlan Bakeries to be a direct competitor of Uncle B's Bakery clearly covered by the terms of the non-competition agreement and the preliminary injunction. O'Rourke testified credibly that he was unaware of any aspect of Harlan Bakeries' operations apart from the planned production of bagels at the facility he was to manage, and he understood all of the bagels made at that facility were destined for a specific chain of retail, non-supermarket stores. Everything O'Rourke knew about Harlan Bakeries had been learned either from a "headhunter," that is, a management placement company, or from his contact with Harlan Bakeries concerning the specific job in question.

O'Rourke has now obtained a second offer of employment, to begin in mid- or late-September, with The Grain Baker's Bakery, Inc.[5] The Grain Baker's Bakery is a start-up

---

**5.** O'Rourke testified that other offers of employment or expressions of interest in offering him employment dried up when the prospective employer was apprised of the terms of the preliminary injunction in this case. O'Rourke testified that this occurred even when he was seeking employment with a non-bagel, or even non-bakery, division of a food company that also happened to have a bagel-making division, because those companies were concerned that they might fall with the preliminary injunction's prohibition on "indirect" competition. This scenario, O'Rourke testified, played out with a multi-na-

tional company that was interested in employing O'Rourke to run bakeries in China and Hong Kong. O'Rourke had gone so far as to travel to China and Hong Kong investigating the job prospect there. O'Rourke testified that another job prospect with a bakery company that makes hamburger buns for McDonald's restaurants fell through over concerns that McDonald's might also require bagels on an expanded menu. However, O'Rourke testified that only this week he has entered hopeful negotiations with a regional baking company that provides fresh bread prod-

company not yet in operation that will produce and ship frozen, never cooked bagels to specific retail outlets. According to The Grain Baker's Bakery's business plan, and the testimony of H. Thomas Dunck, one of its principals, The Grain Baker's Bakery will not complete the cooking and packaging of its bagels for retail sale in supermarket bread aisles or refrigerated cases or for food service companies. Instead, it will focus on in-store bakeries that will receive the product frozen, then thaw and cook it themselves. The finished bagels will then be sold out of in-store bakeries.

The Grain Baker's Bakery has an option to purchase an existing facility with certain existing freezers and flour silos, but it will need to purchase all other line equipment, including mixers, dividers, and formers. Mr. Dunck testified that O'Rourke's responsibilities will include assisting in the purchase of that equipment and the layout of The Grain Baker's Bakery's production line. However, Mr. Dunck also testified that all of the required equipment is non-proprietary equipment available from equipment suppliers or on the used equipment market. Furthermore, The Grain Baker's Bakery has no plans at this time to use any of the "controlled atmosphere packaging (CAP)" or "modified atmosphere packaging (MAP)" techniques that Uncle B's Bakery asserted as trade secrets. Nor will it employ the "special ... cold treatments to the bagels to shorten the period of 'retarding,' or refrigerated rising, [of the bagels] after the yeast are activated" that Uncle B's Bakery asserted were a trade secret in the preliminary injunction proceedings. *Uncle B's Bakery,* 920 F.Supp. at 1413. In fact, Mr. Dunck testified that The Grain Baker's Bakery was willing to make the following commitments to ensure that it would not pose a threat to Uncle B's Bakery if it employed O'Rourke: The Grain Baker's Bakery would not make a fresh, never frozen bagel; would not make a refrigerator case bagel; would not between now and trial make a bread aisle bagel; would not use the MAP or CAP process, ziplock bags, or ice fermentation prior to trial; and would submit to *in camera* comparisons by the court of its recipes with Uncle B's Bakery's, as well as court-supervised reporting of its business activities. Nonetheless, Mr. Dunck properly conceded that The Grain Baker's Bakery is at least an indirect competitor of Uncle B's Bakery, and therefore he acknowledges that a modification of the preliminary injunction is required before he can or will employ O'Rourke.

Mr. Dunck testified further that The Grain Baker's Bakery is not yet fully capitalized, and its target date to begin operations, January 1, 1997, therefore becomes more and more difficult to meet. Mr. Dunck's expectation remained, however, that by the time this matter is set for trial on the merits in August of 1997, The Grain Baker's Bakery will have done several hundred thousand dollars worth of sales in the bagel business. The court finds such gross sales, however, do not represent a significant inroad into the annual sales of bagels in this country, which The Grain Baker's Bakery estimated last year had been approximately $2.3 billion, nor do such sales represent a significant degree of competition with Uncle B's Bakery, which already enjoys multi-million dollar annual sales. The Grain Baker's Bakery's potential for competition in the next few years, however, is much more significant. The Grain Baker's Bakery's projections are that it will have $7.5 million in sales from its initial strong customer contacts, and those sales will grow to $10 million in three years. Mr. Dunck testified that The Grain Baker's Bakery's four principals have over one hundred years of bagel making experience between them, but that it was "essential" that The Grain Baker's Bakery hire a person with operations management experience. Mr. Dunck testified, however, that although O'Rourke has the necessary experience, O'Rourke himself was not necessarily essential to the success of The Grain Baker's Bakery.

ucts to supermarkets and stores in the New York City and Long Island area. This company does approximately eighty-five percent of its business in "Italian" breads, with the remainder in other kinds of ethnic breads, including some produc-

tion of bagels. Nonetheless, it appears to the court that only the Harlan Bakeries and The Grain Baker's Bakery companies made "firm" offers of employment.

By contrast to The Grain Baker's Bakery's plans to produce frozen, raw bagels for baking and sale by in-store bakeries, Uncle B's Bakery has produced primarily "fresh, never frozen" bagels for sale in the bread aisles or refrigerated cases of supermarkets. Uncle B's Bakery recently signed a contract with Heinz Bakery Products, a company owned by H.J. Heinz Company, under which Uncle B's Bakery will devote a significant portion of its growth and production to providing Heinz with cooked, frozen bagels for the food service business. This is a portion of the bagel market in which it does not appear at this time that The Grain Baker's Bakery will be competing. The Grain Baker's Bakery's business plan indicates that, of the total bagel market for 1996, The Grain Baker's Bakery will be aiming at the thirty-one percent of the bagel market that is "in-store bakeries." Again, by way of contrast, O'Rourke asserts, and the court finds that Uncle B's Bakery aims at the six percent of the bagel market The Grain Baker's Bakery's business plan estimates is occupied by refrigerator and food service bagels. The court also finds that Uncle B's Bakery aims to sell bagels in the thirteen percent of the market The Grain Baker's Bakery's business plan indicates is occupied by bread aisle bagels.

O'Rourke asserts that these facts demonstrate both that The Grain Baker's Bakery does not compete, either directly or indirectly, with Uncle B's Bakery, and that there is no risk of any disclosure of Uncle B's Bakery's asserted trade secrets or confidential information. However, the court finds that both companies will eventually be producing bagels for sale in supermarkets, either as the entirety of their business, in the case of The Grain Baker's Bakery, or as a significant portion of their business, in the case of Uncle B's Bakery. In its prior ruling granting Uncle B's Bakery's application for a preliminary injunction, the court made the following observations:

> The court is convinced that whether or not bagel producers consider the slight difference in the location in which their bagels are sold in a supermarket to be of overweening significance to their perception of whether or not their bagels "compete," to consumers, grocery store bagels are grocery store bagels—at least in the absence of any empirical or other evidence to the contrary. By contrast, the court recognizes that a consumer might not conceive of bagel producers as "direct competitors" where one produces grocery store bagels and the other produces fresh bagels sold on site in its own bakery outlets or franchised restaurants.

*Uncle B's Bakery, Inc.,* 920 F.Supp. at 1412. At the hearing, O'Rourke did not produce any empirical evidence as to whether bagels sold by an in-store bakery are perceived by consumers to "compete" with bread aisle or refrigerator case bagels sold in the same store. Instead, O'Rourke presented Mr. Dunck's anecdotal testimony that another maker of raw, frozen bagels for in-store bakeries for which he used to work did not perceive Uncle B's Bakery to be a "direct" competitor. However, Mr. Dunck was also realistic enough to concede that The Grain Baker's Bakery and Uncle B's Bakery were at least "indirect" competitors. The court recognizes that bagels sold in in-store bakeries fall somewhere between bread aisle, refrigerator case, and freezer case bagels, on the one hand, and the "fresh bagels sold on site in [the retailer's] own bakery outlets or franchised restaurants" referred to in the court's prior ruling, on the other. *Id.* Nonetheless, all of the bagels at issue here, with the exception of Uncle B's Bakery's "food service" bagels, are representatives of the choices of bagel products a consumer faces once he or she enters a supermarket. The court therefore finds that all of these products, and the companies that produce them, are at least provisionally direct or indirect competitors. In light of this conclusion that the two companies in question here are at least indirect competitors, the court finds further significance in the undisputed testimony of William Rose, Jr., that O'Rourke's knowledge of Uncle B's Bakery's operations could place a company like The Grain Baker's Bakery as much as a year ahead in reaching the market with directly competing products.

Finally, O'Rourke submitted Uncle B's Bakery's answers to interrogatories indicating that Uncle B's Bakery has as yet been

able to identify no disclosures of any information by O'Rourke nor any damages to Uncle B's Bakery as the result of any acts of the defendants. These interrogatory answers, however, indicate that discovery is continuing, and therefore Uncle B's Bakery intends to supplement its answers when discovery is complete.

## III. LEGAL ANALYSIS

The court considered extensively the standards applicable to the issuance of a preliminary injunction in this case in its prior ruling granting Uncle B's Bakery's application for a preliminary injunction. *See Uncle B's Bakery, Inc.*, 920 F.Supp. at 1421–23. The first question in this case, however, is what standards are applicable to the modification or vacation of a preliminary injunction already issued by the district court.

### A. Standards For Vacation Or Modification Of A Preliminary Injunction

█ The Eighth Circuit Court of Appeals has held that "[t]he absence of irreparable harm 'is sufficient grounds for vacating a preliminary injunction.'" *Local Union No. 884, United Rubber, Cork, Linoleum, and Plastic Workers of Am. v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1355 (8th Cir.1995) (quoting *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738 (8th Cir.1989) (*en banc*)); *and compare Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472–73 (8th Cir.1994) (district court abused its discretion in rescinding a preliminary injunction where a threat of irreparable harm would continue if the preliminary injunction was not reinstated). Thus, this court will not vacate the preliminary injunction unless it is convinced that there no longer exists any threat of irreparable harm.

█ When the question is whether to modify a preliminary injunction, the court of appeals will review the district court's decision for abuse of discretion. *Omaha Indem. Co. v. Wining*, 949 F.2d 235 (8th Cir.1991). The Eighth Circuit Court of Appeals has also provided some guidance for the district court's exercise of its discretion:

When considering whether to modify a preliminary injunction, "a district court is not bound by a strict standard of changed circumstances but is authorized to make any changes in the injunction that are equitable in light of subsequent changes in the facts or the law." *Movie Systems, Inc. [v. MAD Minneapolis Audio Distrib.]*, 717 F.2d [427,] 430 [ (8th Cir.1983) ]; *cf. McDonald v. Armontrout*, 908 F.2d 388, 390 (8th Cir.1990) (consent decree context).

*Omaha Indem. Co.*, 949 F.2d at 239 (the district court did not abuse its discretion in strengthening a preliminary injunction in light of the defendant's conduct suggesting the defendant intentionally ignored or sought to circumvent the original preliminary injunction); *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 670–71 (8th Cir.1987) (the district court did not abuse its discretion in modifying a preliminary injunction to provide that one perfume maker put a disclaimer sticker on its perfume to distinguish it from another maker's, because the disclaimer was adequate to cure any confusion and drew attention to itself). In *Movie Sys., Inc.*, the Eighth Circuit Court of Appeals specifically rejected an argument based on prior decisions that the modification of a preliminary injunction requires "a strong showing of new conditions and circumstances making the original injunction oppressive," holding instead that no such strict standard is authorized. *Movie Sys., Inc.*, 717 F.2d at 430. In addition to modifications that "are equitable in light of subsequent changes in the facts or the law," the court added that modifications might be made "for any other good reason." *Id.* (citing generally 7 J. MOORE & J. LUCAS, MOORE'S FEDERAL PRACTICE ¶ 65.07 (2d ed. 1982), and [Interim Binder] FEDERAL PROCEDURE, LAWYERS EDITION § 47.61 (1981)).

### B. Vacation Or Modification Here

#### 1. Direct or indirect competition

█ O'Rourke appears to argue, at least as a first line of attack, that Uncle B's Bakery's present inability to demonstrate disclosures and damages means Uncle B's Bakery cannot show irreparable harm, and therefore the preliminary injunction should be vacated

in its entirety. In its prior ruling granting the preliminary injunction, this court ruled as follows:

> Here, the Confidentiality Agreement specifically states that the parties agree that any violation of its terms "will cause Company immediate and irreparable harm which money damages cannot adequately remedy." Confidentiality Agreement, p. 2, ¶ 2; *accord Overholt Crop Ins. Serv. Co. [v. Travis]*, 941 F.2d [1361,] 1371 [ (8th Cir.1991) ] (holding that "[i]rreparable harm 'can be inferred from a trial court's actual finding of a breach [of a restrictive covenant] by the defendant.'"); *Curtis 1000, [Inc. v. Youngblade]*, 878 F.Supp. [1224,] 1273 [ (N.D.Iowa 1995) ]; *Millard [v. Electronic Cable Specialists]*, 790 F.Supp. [857,] 860 [ (D.Minn.1992) ] ("Courts infer irreparable harm upon the breach of a non-competition covenant where confidential information is involved."). The court has found, at least provisionally, that O'Rourke agreed to be bound by the terms of this agreement, and therefore concludes that, at least as to its "trade secrets" claims, Uncle B's Bakery has adequately demonstrated a threat of irreparable harm, because there is a threat of a breach of the agreement implicit in O'Rourke's employment with a competitor. Similarly, the court finds that there is comparable language in the "Non–Disclosure/Non–Compete" Agreement, and the court has also found that Uncle B's Bakery has shown a reasonable likelihood that this agreement is binding on O'Rourke.

*Uncle B's Bakery, Inc.,* 920 F.Supp. at 1434. The court finds no grounds to retreat from this holding, even though Uncle B's Bakery has not yet demonstrated any actual injury. The critical question for whether O'Rourke is entitled to either a vacation or a modification of the preliminary injunction to allow him to work for The Grain Baker's Bakery is whether there is a threat of disclosure of trade secrets that is "implicit" in O'Rourke's future employment with The Grain Baker's Bakery or any other company. *Id.* That question, the court concludes, turns on whether The Grain Baker's Bakery or another company "competes, directly or indirectly," with Uncle B's Bakery. *Id.* ("Uncle B's Bakery has adequately demonstrated a threat of irreparable harm [where] there is a threat of a breach of the agreement implicit in O'Rourke's employment with a competitor.").

The court found above, at least provisionally, that The Grain Baker's Bakery is or will be a direct or indirect competitor of Uncle B's Bakery, because both sell or intend to sell bagel products that represent choices to a consumer who enters a supermarket. Furthermore, despite Mr. Dunck's commitments, O'Rourke has presented insufficient evidence to distinguish The Grain Baker's Bakery from his former employer, Brooklyn Bagel Boys, as to the possibility that The Grain Baker's Bakery will employ Uncle B's Bakery's assertedly secret processes and technology. In its prior ruling, this court wrote,

> Although Brooklyn Bagel Boys purportedly has no current plans to enter the refrigerated, never frozen sector of the grocery store bagel market, and suggested that it could not use Uncle B's Bakery's processes or technology for its current purposes, Brooklyn Bagel Boys' representative indicated circumstances in which it would re-evaluate its product lines and develop a product along Uncle B's Bakery's lines. Thus, it is clear, at least on the preliminary injunction record, that Uncle B's Bakery has reason to fear that Brooklyn Bagel Boys will be motivated to appropriate its technology and processes, and the threat of disclosure of those processes and that technology poses a threat of irreparable harm.

*Id.* at 1436. Similarly, where The Grain Baker's Bakery is not yet in production, and consequently can probably strike out in new directions in a way an existing business might find difficult, and O'Rourke asks this court to assume much from a preliminary business plan, the court finds that Uncle B's Bakery has reason to fear The Grain Baker's Bakery or some other direct or indirect competitor will be motivated to appropriate Uncle B's Bakery's technology and processes.

This conclusion is by no means meant to cast any doubt on the sincerity of Mr. Dunck's commitments to avoid certain avenues of development. Indeed, the court

found Mr. Dunck to be entirely credible. The court appreciated Mr. Dunck's candid testimony and has no doubts of his willingness to keep the commitments he made at the hearing. Nevertheless, the concerns about The Grain Baker's Bakery's, or some other employer's, potential appropriations of Uncle B's Bakery's proprietary information, even from inadvertent disclosures, remain significant. What concerns the court as to O'Rourke's employment with The Grain Baker's Bakery is that, even without any improper appropriation of Uncle B's Bakery's proprietary information, The Grain Baker's Bakery will be at least an indirect competitor, and hence is one of the kinds of companies with which O'Rourke's employment was intended to be precluded by the covenant not to compete.

The court therefore holds that O'Rourke is not entitled to have the preliminary injunction vacated in its entirety on the ground that there is an absence of the threat of irreparable harm. *See Baker Elec. Co-op., Inc.*, 28 F.3d at 1472–73 (district court abused its discretion in vacating preliminary injunction where a threat of irreparable harm remained); *and compare Local Union No. 884, United Rubber, Cork, Linoleum, and Plastic Workers of Am.*, 61 F.3d 1347, 1355 ("[t]he absence of irreparable harm 'is sufficient grounds for vacating a preliminary injunction,'" quoting *Modern Computer Sys., Inc.*, 871 F.2d at 738). Whether the preliminary injunction should be modified, however, is a more complicated question.

### 2. *"Hardship" or "oppression"*

■ Yet, O'Rourke asserts that the hardship already imposed by his loss of employment indicates that the preliminary injunction has been sufficiently "oppressive" to entitle him to a modification of the preliminary injunction that would allow him to take the job with The Grain Baker's Bakery, citing WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2961, p. 396. *Cf. Movie Sys., Inc.*, 717 F.2d at 430 (modification may occur for "any other good reason"). O'Rourke also contrasts continuation of the present preliminary injunction with the determinations of the Iowa Supreme Court in *Ma &*

*Pa, Inc. v. Kelly,* 342 N.W.2d 500 (Iowa 1984), and *Iowa Glass Depot, Inc. v. Jindrich,* 338 N.W.2d 376, 381 (Iowa 1983), that non-competition clauses should not be enforced in circumstances O'Rourke asserts are similar to his own.

In its prior opinion, in conducting the "balance of harms" required by the *Dataphase* analysis for issuance of a preliminary injunction, the court opined that it was "not unmindful of the harms O'Rourke may suffer if he loses his current employment, but the court has every reason to believe that those harms will be short-lived...." *Uncle B's Bakery, Inc.,* 920 F.Supp. at 1438. Regrettably, the harms to O'Rourke have not been as short-lived as the court had hoped, in light of O'Rourke's excellent qualifications. Yet, the court cannot accept O'Rourke's argument that harm to him alone suffices to put aside the terms of the covenant not to compete or the preliminary injunction entered to enforce its terms. To hold so would render nugatory a covenant not to compete any time the covenantee suffers financial distress, even when the extent of that financial distress is entirely within the range reasonably contemplated by any such covenant and is not out of proportion to the potential harms to the employer. Nonetheless, the court will take a closer look at the cases upon which O'Rourke relies to see if they support his argument for a modification.

In *Ma & Pa*, the Iowa Supreme Court found that equity did not favor granting an injunction to enforce a non-competition clause in a contract, despite the fact that the employer had not breached the contract, was "not disentitled to rely on the non-competition clause" thereby, but had instead terminated the employee for cause, where the employee had failed to find employment for three weeks using his "only skill" in sales and he and his family were suffering financial hardships. *Ma & Pa*, 342 N.W.2d at 502–03. O'Rourke points out that he has now been without work for much more than three weeks, and asserts he has been unable to find a job using his only skill, which he describes as "plant operations." In *Iowa Glass Depot, Inc.*, the Iowa Supreme Court concluded that enforcement of a non-competi-

tion clause was "not reasonably necessary for the protection of [the employer's] business and would be unreasonably restrictive of [the employee's] rights." *Iowa Glass Depot, Inc.,* 338 N.W.2d at 385. O'Rourke contends that the lack of evidence of any harm to Uncle B's Bakery indicates that the covenant here is not reasonably necessary. Uncle B's Bakery argues that these cases set forth the standard for enforcement of a non-competition clause in an employment contract, but do not set forth the standards for modification of a preliminary injunction. Uncle B's Bakery argues that this court has already found the preliminary injunction reasonably necessary to protect Uncle B's Bakery's interests and has balanced that need against O'Rourke's potential financial hardship.

The court finds that the key to the decisions in *Iowa Glass Depot, Inc., Ma & Pa,* and other decisions of the Iowa courts is not "hardship" or "oppression" to the restricted employee, but a *balance* of that harm against the potential harm to the employer. Thus, the court looked not just at hardship to the employee, but to the question of whether the covenant was "reasonably necessary" to the employer. For example, in *Iowa Glass Depot, Inc.,* the Iowa Supreme Court wrote,

> The general rule in Iowa is that we will enforce a noncompetitive provision in an employment contract if the covenant is reasonably necessary for the protection of the employer's business and is not unreasonably restrictive of the employee's rights nor prejudicial to the public interest. *Ehlers [v. Iowa Warehouse Co.],* 188 N.W.2d [368,] 369 [ (Iowa 1971) ]. Our rule is analogous to the Restatement rule which provides that a noncompetitive agreement is unreasonably in restraint of trade if "(a) the restraint is greater than is needed to protect the promisee's legitimate interest or (b) the promisee's need is outweighed by the hardship to promisor and the likely injury to the public." Restatement (Second) of Contracts § 188(1). *Essentially, these rules require us to apply a reasonableness standard in maintaining a proper balance between the interests of the employer and the employee.* Although we must afford fair protection to the business interests of the employer, the restriction

on the employee must be no greater than necessary to protect the employer. Moreover, the covenant must not be oppressive or create hardships on the employee *out of proportion* to the benefits the employer may be expected to gain.

*Iowa Glass Depot, Inc.,* 338 N.W.2d at 381 (emphasis added; some citations omitted). The court then specifically held that the enforcement of the covenant "would be unreasonably restrictive of Jindrich's rights." *Iowa Glass Depot, Inc.,* 338 N.W.2d at 385. However, this conclusion was in conjunction with a specific conclusion that "the enforcement of the covenant is not reasonably necessary for the protection of Glass's business." *Id.* In the case presently before this court, the court has indeed found the terms of the preliminary injunction enjoining O'Rourke from employment with a direct or indirect competitor are reasonably necessary to protect Uncle B's Bakery, and the court has also found that The Grain Baker's Bakery is such a competitor. Thus, assuming it was otherwise applicable, *Iowa Glass Depot, Inc.,* is distinguishable.

Although the substantive question addressed in *Ma & Pa,* whether a non-competition agreement should be enforced, may be distinguishable from the substantive question in this case, which is whether O'Rourke is entitled to modification of a preliminary injunction, that decision is not wholly inapplicable to inform the court of what might constitute "other good reason" to modify a preliminary injunction. *Movie Sys., Inc.,* 717 F.2d at 430 (modification may occur for "any other good reason"). However, *Ma & Pa* confirms this court's conclusion that what was at issue was not simply hardship of the employee, but balancing of the interests of the employee and the employer:

> An injunction would work severe hardship on Kelly and his family. Selling is his only skill; he tried to find employment for three weeks before he located the other job; and his employment with Ma & Pa was terminated during recession. Ma & Pa did not show at trial that it tried to renegotiate Kelly's employment contract. The employment was at will, enabling Ma & Pa to terminate it at any time and assert

the clause prohibiting competition. The business Kelly obtained for his new employer does not appear to have derived so much from his personal influence as Ma & Pa's uncompetitive pricing. Finally, the bulk users of petroleum products in the territory must be ascertainable by reasonable diligence without a customer list.

Ma & Pa is correct that it did not breach the contract and is not disentitled to rely on the non-competition clause on that account. It is also right that the clause recites "on the termination of his employment with Employer for any cause whatever...." Moreover, Ma & Pa did not terminate the contract without any cause; it lost money on Kelly's sales. *Nonetheless, the case is in equity, and upon weighing the equities on both sides in our de novo review we conclude that the trial court should not have granted the injunction.*

*Ma & Pa, Inc.,* 342 N.W.2d at 502–03 (internal citations omitted; emphasis added). Here, factors on both sides of the scales are somewhat different: Although O'Rourke's "only skill" might be plant operations, bagel making is not the only area of the food industry in which he is well-qualified to pursue that skill. At least as significant, however, is the greater weight in this case in favor of the continuance of the injunction in light of its reasonable necessity to Uncle B's Bakery.

The court's reading of other Iowa cases further confirms its conclusion that balancing of the employee's hardship against the employer's need, rather than simply recognition of hardship, could constitute grounds to deny enforcement of a covenant not to compete, and hence could constitute "other good cause" to modify an injunction enforcing such a covenant. *See, e.g., Ehlers v. Iowa Warehouse Co.,* 188 N.W.2d 368, 370 (Iowa 1971) (overruling prior precedent, which required enforcement of a covenant not to compete in its entirety or not at all, and instead "adopt[ing] the rule that unless the facts and circumstances indicate bad faith on the part of the employer, we will enforce noncompetitive covenants to the extent they are reasonably necessary to protect [the employer's] legitimate interests without imposing undue hardship on the employee when the public

interest is not adversely affected."); *Dain Bosworth, Inc. v. Brandhorst,* 356 N.W.2d 590, 593 (Iowa Ct.App.1984) (citing the "general rule" of balancing articulated in *Iowa Glass Depot, Inc.,* and concluding that the covenant was "reasonably necessary" to the employer, and that "[t]he noncompetition agreement is not oppressive and did not create disproportionate hardships for [the employee]," where the employee was reemployed during the non-competition period in a non-competing position). Most recently, the Iowa Court of Appeals demonstrated the degree to which hardship is considered in a balancing of equities in *The Phone Connection, Inc. v. Harbst,* 494 N.W.2d 445 (Iowa Ct.App.1992). In that case, the court first found that the covenant was reasonably necessary for the protection of the employer's business. *Id.* at 449. The court turned next to the question of the employee's hardship:

> We also find the restrictive covenant, as modified by the district court, is not unreasonably restrictive of [the employee's] rights. While [the employee] has other vocational skills, his livelihood is tied to the telephone business. [The employee] also has a large family which does not want to move. The district court concluded [the employee] would be unreasonably restricted by the covenant's time and geographical limitations. The court therefore modified the covenant to apply only to the Iowa and Minnesota counties in which The Phone Connection had established its trade area. The court also reduced the time period from five to two years. With these modifications, this covenant does not pose an unnecessary or unreasonable hardship on [the employee].

*The Phone Connection, Inc.,* 494 N.W.2d at 449. Thus, this court concludes, the hardship O'Rourke may have endured alone is not sufficient to modify the preliminary injunction to allow him to work for a direct or indirect competitor. Furthermore, although those hardships may have been longer lasting that the court hoped, they are not out of proportion, either in extent or duration, to what the court anticipated when it entered the injunction. The court contemplated the reality that the injunction would prevent O'Rourke from working for a competitor at

least until the trial on the merits of this matter, and possibly for the entire period specified in the covenant not to compete. Non-competing employment, or employment that does not compete significantly with Uncle B's Bakery, has not been foreclosed nor yet been shown to be impossible to obtain. However, employment with The Grain Baker's Bakery would constitute employment with a direct or indirect competitor, and the court, balancing the equities concludes that it will not modify the preliminary injunction to permit such employment.

### C. Clarification

██ However, O'Rourke has also requested that, at a minimum, the court provide some guidance as to the limits of the preliminary injunction, so that prospective employers may have a clearer idea whether or not they fall into the category of "direct or indirect" competitors with whom employment is prohibited. This the court deems is justified in light of "other good reasons" demonstrated by the record, specifically, the unanticipated shyness of potential employers who only very distantly could be found to compete "indirectly" with Uncle B's Bakery. *See Movie Sys., Inc.,* 717 F.2d at 430 (modification may occur for "any other good reason"). The court perceives this to be a potentially repetitive problem that otherwise would be difficult to address. In these circumstances, the court is not offering an advisory opinion, but is clarifying the scope of the preliminary injunction it has already issued, in light of testimony concerning the reaction of prospective employers to O'Rourke's disclosure of the terms of the preliminary injunction, which often took the form that O'Rourke should "fix the problem" before negotiations could go forward.

It was the court's intention that "direct or indirect" competition should encompass only bagel production, as a wider scope to this language to include, as counsel argued it could, coffee cakes and croissants, or even all bakery goods, would not be reasonably necessary to protect Uncle B's Bakery.[6] Nor was it the court's intent that the restriction

should apply to employment with one division of a company not engaged in bagel making just because some other division of the company produces bagels, at least where some reasonable efforts are made to insulate O'Rourke from any contact with the bagel-making division. To interpret the covenant otherwise would again make it far more restrictive than necessary. Indeed, the court thinks it likely that a local, or even a regional, maker of fresh bakery goods sold in the maker's own outlets or through other supermarket or retail outlets would escape the reasonable reach of the covenant even if bagels were the company's sole product, and almost certainly would escape the reasonable reach of the covenant where bagels were only an incidental portion of the company's business. This is so, not because there is no direct or indirect competition strictly speaking, but because the extent of such competition is unlikely to have any significant impact upon Uncle B's Bakery within the specified duration of the covenant.

### D. Modification

██ The court also concludes that there are "other good reasons" to modify the preliminary injunction to provide an expedited process for determination of whether an offer of employment falls within or without the terms of the restrictions of the preliminary injunction. *See Movie Sys., Inc.,* 717 F.2d at 430 (modification may occur for "any other good reason"). Job offers to O'Rourke must be acted upon within a brief period of time, because employers usually need to fill positions quickly, making the process employed in response to O'Rourke's motion to modify unweildy and dangerously time-consuming. Furthermore, the court deems it unjust to impose upon O'Rourke the expenses of seeking an evidentiary hearing for pre-approval of every job offer.

Therefore, any future job offers or potential job offers shall be screened in the following manner. O'Rourke shall advise Uncle B's Bakery of the potential job, including at a

---

**6.** Although all breakfast foods, and perhaps even all foods, in some sense, "compete" with bagels, the court cannot reasonably give such scope to

"direct or indirect" competition, and would find it patently inequitable to enjoin O'Rourke from working in any sector of the food industry.

minimum the following information: The prospective employer; whether it is a start-up company or already in production; a reasonably specific description of its business; the extent to which its business involves production of bagels for any retail, wholesale, or food service sales; the company's geographic market and outlets for any bakery products, if applicable, and the principal products O'Rourke will be involved in producing, whether bakery or non-bakery; the specific position and division or facility of the prospective employer in which O'Rourke will be employed, including O'Rourke's anticipated duties; any commitments the prospective employer is willing to make either to prevent disclosures to a division of the business that might directly compete with Uncle B's Bakery or to restrict O'Rourke from participating in the production of competing products; and such other information as O'Rourke may consider pertinent or Uncle B's Bakery may reasonably request.

Uncle B's Bakery shall be required to respond to such a request for consent to O'Rourke's employment with the prospective employer within three business days, either by providing such consent or stating good faith, reasonable grounds for denying consent. In the event Uncle B's Bakery approves O'Rourke's employment with the prospective employer, the parties or either one of them shall notify the court by written report that a consent to employment has been obtained, and no further judicial intervention or action shall be required to permit O'Rourke to accept the position. In the event consent is denied, O'Rourke may immediately file a motion with the court by facsimile,[7] also served upon counsel for Uncle B's Bakery by facsimile, requesting approval, and filing therewith a concise statement, not to exceed ten pages, exclusive of supporting documents, specifying grounds for permitting the employment. Uncle B's Bakery shall have three business days following the date of filing within which to respond to the motion, again by filing with the court and serving upon counsel for O'Rourke by facsimile[8]

a concise statement of grounds for denying the employment, not to exceed ten pages, exclusive of supporting documents.

Unless either party expressly requests an expedited evidentiary hearing or oral argument in writing in its motion or response, and unless the court finds such hearing or argument is necessary to its disposition of the motion, the court will rule upon the motion for leave to accept the employment without further hearing, argument, or submissions. If, upon proper request, the court deems a hearing appropriate, it shall be conducted as soon as practicable, which may mean that the hearing will be conducted at an unusual time or place, or in an unusual mode or manner. Again, following such a hearing, the court will rule as soon as possible. If the court finds that Uncle B's Bakery has unreasonably denied its consent to O'Rourke's acceptance of the position in question, the court will impose upon Uncle B's Bakery the costs of such motion, including any hearing or expenses of O'Rourke or his counsel in prosecuting the motion, and may, under proper circumstances, impose other appropriate sanctions.

## IV. CONCLUSION

O'Rourke's motion is **denied** to the extent it requests that the court vacate its preliminary injunction in this case. The court finds that a threat of irreparable harm remains justifying the continuance of the preliminary injunction. O'Rourke's specific request for a modification of the preliminary injunction to permit him to accept employment with The Grain Baker's Bakery is also **denied**, because the court finds The Grain Baker's Bakery to be a direct or indirect competitor of Uncle B's Bakery, and the evidence of hardship to O'Rourke is insufficient to outweigh the reasonable need of Uncle B's Bakery for a prohibition on such employment with a competitor. However, O'Rourke's request for clarification of the terms of the preliminary injunction is **granted** as stated in subsection III.C. above. Furthermore,

---

7. The court will accept facsimile filings to expedite the process as long as "hard copies" are subsequently filed with the Clerk of Court in the usual manner.

8. Again, a "hard copy" of the response must subsequently be filed with the Clerk of Court.

specific modification of the preliminary injunction is **granted** to provide for an expedited procedure to determine whether O'Rourke may accept a specific job offer as described in subsection III.D.

O'Rourke's motion to vacate or modify the preliminary injunction in this case is therefore **granted in part** and **denied in part** consistent with the terms of this order.

**IT IS SO ORDERED.**