**Frank N. RAWLINGS and Shur-Gro Industries, Inc., Plaintiffs,**

v.

**NATIONAL MOLASSES CO., a corporation, et al., Defendants.**

No. 65–592.

United States District Court, C. D. California.

June 10, 1971.

**914**

Richards, Harris & Hubbard, William D. Harris, Jr., Roger C. Clapp, Dallas, Tex., Lyon & Lyon, Roland N. Smoot, Los Angeles, Cal., for plaintiffs.

Connolly, Bove & Lodge, William J. Wier, Jr., Wilmington, Del., Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Beverly Hills, Cal., for defendants.

## MEMORANDUM OPINION

DAVID W. WILLIAMS, District Judge.

After much effort on their part, Philip C. Anderson and Frank N. Rawlings finally convinced the Patent Office that they were entitled to a patent on two claims and on May 29, 1956, they were issued patent No. 2,746,001 (hereinafter '001). It concerned a liquid food supplement for ruminant animals [1] capable of being fed with roughage on a free-choice basis.[2] Rawlings eventually purchased the interest of Anderson in the patent and sold it to Shur-Gro Company on the conditional basis that the patent be held valid in this litigation.

National Molasses Co. is a Delaware corporation whose principal business is the importation and sale of molasses. It manufactures and sells a product containing molasses, urea,[3] and phosphoric acid for use as a liquid, free-choice feed supplement for ruminants. Plaintiffs claim this supplement infringes upon their '001 patent. The Orita Land and Cattle Company, Heber Cattle Feeders, Inc., and Allied Cattle Feeders, Inc. are included as defendants because they purchase the accused product from National Molasses Company. The complaint seeks

1. Any of a group of four-footed, hooved, even-toed, cud chewing mammals, as the cattle (cow), buffalo, bison, goat, deer, antelope, camel, giraffe, llama, etc., which have a stomach consisting of four divisions or chambers, the rumen, reticulum, omasum and abomasum. (T)he grass, etc. that they eat is swallowed unchewed and passes into the rumen from which it is regurgitated, chewed and mixed with saliva, and then passed into the abomasum where it is acted on by the gastric juice. Webster's New World Dictionary, College Edition, Page 1275.

2. The supplement of liquid molasses-urea-phosphoric acid is placed in one container alongside roughage (often corncobs or grass) and the animal eats what it wants of each, i.e., free-choice. This was explained as offering food to cows "cafeteria style". This diet is said to be self-limiting; the animal consumes the proper proportions of roughage and supplement.

3. Urea, a white compound which may be crystallized from the urine, is the final product of the decomposition of proteins in the body. It is believed to be formed in the liver from amino acids and other compounds of ammonia.

injunctive relief and damages. Defendants deny infringement and challenge the validity of the patent. After hearing the evidence this Court concludes that the '001 patent is invalid under 35 U.S.C. §§ 102 and 103 and there can be no infringement.

## CLAIMS OF THE PATENT

Ruminant animals derive protein nutriment as a result of the interaction of bacteria and ingested material in their rumen. One expressed object of the claimed invention is to devise a food supplement that will stimulate the growth of such bacteria so they and their by-products may be digested within the true stomach of the host animal and turned into flesh. The supplement thus serves to fatten the animal. The '001 patent says that for maximum effectiveness the bacteria must be given more than non-protein nitrogen such as urea; they also must be given other nutrients such as soluble phosphorus, trace minerals and soluble carbohydrates, in addition to roughage. The liquid nutrients make the bacteria multiply rapidly. However, the food supplement must be made palatable so the animal will consume it on a free-choice basis in adequate but not excessive amounts. The liquid must also not ferment or attract insects, and it must not be too viscous or corrosive.

The patent sets forth the basis starting materials as urea, phosphoric acid (or a phosphate), molasses and water. Trace minerals and vitamins are sometimes added for specific purposes, but the vitamins must be stabilized. Urea is a crystalline compound not readily soluble in molasses. Therefore one obstacle which must be overcome is to develop a means of getting the urea and phosphoric acid homogeneously dispersed in solution with the molasses. The patent alleges that one of its objects is to discover both the critical limits of the proportionate amounts of each of these ingredients and any critical quantitative relation that may exist between the liquid supplement and the total ration. The supplement is prepared by properly mixing phosphoric acid (or a phosphate) and urea, molasses, and water in a controlled amount. It suggests mixing the phosphoric acid with urea in water at temperatures between 150° and 170° F and afterwards mixing the solution with molasses.

The only claim being litigated in this action is Claim 2 which reads as follows:

"A feed molasses-urea-phosphoric acid liquid supplement for ruminants that is free-flowing, non-fermentable, non-attractive to insects, vitamin-stabilizing, and provides its essential nutrients in solution for the rumen's micro-organisms upon which the host animal is dependent, which comprises a water solution of phosphoric acid, urea and molasses, in proportions wherein the quantity of the molasses present is more than one-half the supplement by weight, the quantity of the urea present lies in a range of from 2% to 20% of the supplement by weight, the quantity of the water present including water in the molasses lies in a range of from 25% to 35% of the supplement by weight, and the quantity of the phosphoric acid present is sufficient to provide phosphorus in a range of from 0.27% to 2.0% of the supplement by weight, whereby there is yielded a supplement so palatable to the ruminant that the ruminant by its own free choice will consume it as well as its normally-consumed roughage."

## THE APPLICATION

Anderson and Rawlings filed their first application for a patent on their food supplement on December 29, 1951. In it they specified that they had devised an improved feed comprised of urea, molasses and phosphoric acid, which could be employed as a supplement in connection with bulk. This application admitted that urea had long been used as a source of protein nitrogen for cattle feeding but that theretofore it had been felt dangerous to give cattle more urea than would supply ⅓ of their protein needs. The application stated that one object of the invention was the use of urea at higher levels of protein replace-

ment than the 1/3 level earlier thought safe. They claimed that their discovery accomplishes this by its inclusion of phosphoric acid in the compound since the acid appears to "exert favorable action in fostering the greatest bacterial activity in the rumen."

This application set forth its claims as follows:

"WE CLAIM:

(1) A feed supplement for ruminants comprising essentially urea, molasses and phosphoric acid.

(2) A feed supplement for ruminants comprising essentially urea, molasses, phosphoric acid and bulk carbohydrates.

(3) A feed supplement for ruminants comprising essentially urea, molasses, phosphoric acid and corn cobs.

(4) The composition of claim 1 wherein the proportion of urea is from about 10% to 20% of the total weight.

(5) A feed supplement for ruminants comprising approximately 75 parts of urea, 375 parts of molasses, 16 parts of phosphoric acid (75%) and 62 parts of water, all of the parts being by weight.

(6) A feed supplement for ruminants comprising approximately 75 parts of urea, 375 parts of molasses, 16 parts of phosphoric acid (75%), 62 parts of water and 2 parts of ferrous sulphate, all of the parts being by weight."

The examiner rejected each of the above claims by his report dated December 29, 1951, which said in pertinent part:

"All the claims are rejected as lacking invention over the patents cited above wherein feed supplements of ruminants are shown to include various combinations of urea, molasses, and so forth as Note page 2 of Block above. Applicants inclusion of an acid (phosphoric acid) for preserving purposes is held nothing more than the generally well-known use of acid for this purpose. No unusual or unexpected coaction is apparent between the ingredients of the present product nor are the percentages recited in claims 4 to 6 critical to warrant basing patentability thereon.

No claims are allowed."

Anderson and Rawlings then changed attorneys and attempted to restate their claims in new language only to have the examiner reject the new claims as unpatentable over cited prior art and to advise that earlier patents disclosed the combination of urea and molasses and taught the addition or the necessity for phosphates or phosphoric acid in animal feeds containing molasses. He concluded that "the addition of phosphoric acid to the urea-molasses combination is without invention."

Anderson and Rawlings then abandoned the first application and replaced it by filing a continuation-in-part application on August 6, 1953.[4] This differed from the parent application in that the claims contained the following changes:

(a) the percentage of urea was increased,

(b) a specific range was set for the amount of water in the composition,

4. It is interesting to know that during the course of their discovery, the defendants turned up a letter from Rawlings to Anderson written between February and October, 1953 and referring to Arthur Middleton, their patent lawyer, which read as follows:

"Spent all day with Middleton. The only tough problem we faced was the wrong urea percentage figures that were used in the initial application.

The Patent Office would not allow these limits to be changed on the basis that they were fundamental in defining the invention as claimed and that any change would constitute new material. Middleton will try to get around it by changing his claims to define the limits on a nitrogen basis as applied to the total ration. The examiner may not be subtle enough to follow the change."

(c) a pH [5] range of 4 to 4.75 was inserted into the claims. The applicants asserted that the hydrogen ion concentration as measured by a pH between 4 and 4.75 was critical; any pH level falling outside this range rendered the invention less operative. Moreover, the ingredient ranges were claimed in terms of ration rather than supplement percentages. The allowed claims, however, mentioned no pH limitations.

The second application resulted in the following rejection by the examiner:

"All the claims are rejected as unpatentable over the art as applied herein. Block discloses the combination of urea and molasses in feed. Stiles discloses the combination of ammonia, molasses and phosphoric acid and in addition suggests (col. 2 line 15) the equivalency of ammonia and urea in this relationship. No invention would appear to be involved in the substitution of urea in the Stiles composition or the omission of the other ingredients disclosed in Block. *The selection of a pH range which is considered suitable does not involve invention.* (Emphasis ours). Turner, it will be noted, further discloses the equivalency of urea and ammonia. The British patent further suggests the incorporation of phosphoric acid in molasses. All the claims are rejected."

When the applicants attempted to get a review of their new claims the examiner responded on April 22, 1954, saying:

"As to the pH range or the proportions of urea and phosphoric acid, these are obviously important and may be critical in this sense. *But there is no evidence that the selection of these limits involves invention. On the contrary, it would appear that one skilled in the art would select the suitable proportions without the exercise of invention.*" (Emphasis ours)

Further efforts on the part of the applicants' attorney to gain reconsideration of the continuation-in-part application resulted in the examiner replying on April 29, 1955:

"Applicants urge that the 'critical limits claimed amount to invention * * *'. However, given the teaching in the references of the instant composition, the selection of the optimum proportions is a matter of judgment and routine experimentation which does not involve invention."

■ Certain amendments to the original claims were then forwarded to the Patent Office by the applicants' attorney and the examiner rejected all but Claim 2. Applicants then filed an amendment asking cancellation of the allowed claim so they could file two new claims which, in effect, restated the allowed claim, and these two claims were on January 23, 1956 allowed and the '001 patent issued. I have taken the time to quote liberally from the communications that took place between the applicants and the examiner in both the parent and continuation-in-part application because it is puzzling that the patent was granted on the heels of such positive assertions on the part of the examiner.[6]

## VALIDITY OF THE PATENT

*Novelty*

Although the principal validity issues are concerned with "obviousness" under

---

5. pH is a measure of hydrogen ion concentration. A solution having a pH of 7 is neutral. As the pH of a solution decreases, the hydrogen ion concentration increases, and the solution becomes correspondingly more acidic. Conversely, as the pH increases the solution becomes less acidic and more alkaline.

6. Where a patentee constantly shifts positions and arguments as to basic novelty of his patented processes and the patent did no more than record and claim a mere natural reaction or result, his acts are strongly indicative of the inherent unpatentability of the processes. Vincent v. Suni-Citrus Products Co., 215 F.2d 305, 313 (5th Cir., 1954) cert. den. 348 U.S. 952, 75 S.Ct. 440, 99 L.Ed. 744.

35 U.S.C. § 103, defendant also raises the question whether Anderson and Rawlings were the inventors of the supplement set forth in the patent in suit. This issue arises under 35 U.S.C. § 102 which states:

"A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(c) he has abandoned the invention, or

(d) the invention was first patented or caused to be patented by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application filed more than twelve months before the filing of the application in the United States, or

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or

(f) he did not himself invent the subject matter sought to be patented, or

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other."

Deller's, Walker on Patents, § 58 at 245 (2d ed. 1964), observes that "(t)o be novel, an invention must not have been anticipated by prior knowledge or use, a prior patent, a prior publication, prior public use or a prior sale." If there has been a substantially identical prior invention, then novelty may be lacking. The novelty test under § 102 is clearly delineated in Beckman Instruments, Inc. v. Chemtronics, Inc., 428 F.2d 555 (5th Cir. 1970) which says at 561:

"Section 102, which pertains to novelty, requires that the patentee be the original inventor of the object claimed in his patent, and also that the invention not have been known or used by others before his discovery of it. Thus one obviously cannot be the original inventor if someone else has described or used the subject matter of the claims before the earliest moment to which he can trace his invention."

This is not to say, however, that a patented invention may be invalidated piecemeal under § 102 by finding individual features separately in the prior art. Imhaeuser v. Buerk, 101 U.S. 647, 25 L.Ed. 945 (1880); Firestone v. Aluminum Co. of America, 285 F.2d 928 (6th Cir. 1960).

This Court sees the food supplement which is the subject of the '001 patent as nothing more than a reiteration of the Stiles and Turner patents. The language of the patent examiner in rejecting the application of Anderson and Rawlings is quite instructive. He correctly observes that the '001 patent involves essentially the stating of the equivalency arrangement suggested in the Stiles patent and already shown to be feasible in the Block and Turner patents. Further, the absence of any invention is admitted in the 1953 letter written by Rawlings to Anderson. Unlike a "nose of wax" a patent cannot be twisted one way to avoid anticipation and another way to find infringement. White v. Dunbar, 119 U.S. 47, 7 S.Ct. 72, 30 L.Ed. 303 (1886).

*Non-obviousness*

Section 103 of Title 35 of United States Code tells us that a patent may

not be obtained if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the invention to a person having ordinary skill in the art to which said subject matter pertains.[7]

An analysis of the obviousness or nonobviousness of the claims in suit must find its starting point in the requirements laid down by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Justice Clark presenting the opinion of the Court states at 17, 86 S.Ct. at 694:

"While the ultimate question of patent validity is one of law, A. & P. Tea Co. v. Supermarket [Equipment] Corp., *supra,* [340 U.S. 147] at 155 [71 S.Ct. 127 at 131, 95 L.Ed. 162 at 168], the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

The Supreme Court has recently admonished that "strict observance" of the John Deere requirements is necessary. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 62, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969). This Court views the record in the case at bar as adequate for determining the question of obviousness in the light of John Deere.

The prior art as manifested by the Block, Turner, and Stiles patents indicates that the use of molasses, urea, and phosphoric acid as part of a food supplement for ruminants was known prior to the patent-in-suit and had previously been used.

Norman Richins, owner of Western Cattle Feeders of Blythe, California, testified that in 1950 he fed his cattle with Promol (10% urea–90% molasses) to which phosphoric acid had been added in the amount of 3%. He discontinued use of this combination shortly after the Korean War began because the Monsanto Co. advised him that war demands required them to curtail the sale of phosphoric acid.

Professor J. Riggs of Texas A & M testified that in 1948 he mixed a solution of 80% molasses, 10% urea and 2% phosphoric acid and fed it free-choice to cattle on the college farm and that his students assisted in this experiment.

Roswell Garst, owner of a cattle ranch at Coon Rapids, Iowa testified that as early as 1948 he fed his cattle Promol (molasses-urea) and phosphorous and calcium on the side free-choice, along with corn cobs for roughage.

There is evidence that Anderson visited Roswell Garst's farm in 1951 and that he knew Garst was feeding his cattle liquid molasses-urea with ground corn cobs. Later he and Rawlings modified Garst's ration by adding phosphoric acid and water thereto. They never advised the Patent Office of Garst's work or its similarity to their own claims of invention.

7. § 103. "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

920

This Court finds that it would have been obvious to one of ordinary skill in the art in 1951 to incorporate phosphorus into a molasses-urea solution like Promol rather than feeding it on the side as Garst did. If fermentation of the molasses-urea was a problem, the most logical phosphorus compound to have used would have been phosphoric acid because of its known preservative action. It would have been obvious to one of ordinary skill in the art in 1951 to modify Mills'[8] molasses-urea-bone meal-water-mixture by replacing the bone meal with phosphoric acid. This was but a substitution of equivalents since bone meal and phosphoric acid are known to be interchangeable sources of phosphorus for ruminant animals. Also it would have been obvious in 1951 to modify Burdick's[9] ammoniated molasses-phosphoric acid solution by substituting molasses-urea for ammoniated molasses, the examiner having found these to be equivalent for this purpose. Anderson and Rawlings indicated that they decided to use phosphoric acid as a source of phosphorus because it was convenient, liquid, and could be readily mixed. Essentially, the '001 patent does not more than add phosphoric acid to molasses-urea, yet it claims the resultant supplement is an invention.

■ The prerequisites for a valid combination patent have been established by the Supreme Court. A mere aggregation of a number of old elements which, in the aggregate, perform or produce no new or different function than previously was performed or produced by them, is not a patentable invention. Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008 (1938). However, a patent may issue if the combination produces a synergistic effect. A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950). The evidence in the case at bar makes it clear that there was no Gestalt effect provided by the plaintiffs' claimed patent which had not already been produced by the prior art. The plaintiffs' patent is obvious under § 103.

The patent is held to be invalid under Sections 102 and 103 and judgment is ordered entered for the defendants.

---

8. Mills' et al publication, "Utilization of Urea and Growth of Heifer Calves With Corn Molasses or Cane Molasses as the Only Readily Available Carbohydrate in the Ration". Journal of Dairy Science, Vol. XXVII, No. 7 (July, 1944) at 571–78.

9. Burdick, Patent No. 2,724,648 filed October 31, 1951, describes a ruminant animal feed containing ammoniated molasses to which an acid is added to bring its pH down to between 5 and 7. Burdick prefers the addition of phosphoric acid to raise the phosphorus content of the product.