1997 SD 111

**Jim WEINS and Mac Meyer, Plaintiffs and Appellees,**

**v.**

**Robert SPORLEDER, Merle Van Liere and EN–R–G Max, Inc., Defendants and Appellants.**

Nos. 19307, 19308, 19310 and 19315.

Supreme Court of South Dakota.

Argued Dec. 3, 1996.

Decided Sept. 3, 1997.

Rehearing Denied Oct. 9, 1997.

Rick Johnson of Johnson, Eklund, Nichol-
son, Peterson & Fox, Gregory, and David
Vrooman, Sioux Falls, for plaintiffs and ap-
pellees.

Gale Fisher, Sioux Falls, for defendant and
appellant.

Michael J. Schaffer and Cheryle Wiedmei-
er of Davenport, Evans, Hurwitz & Smith,
Sioux Falls, for defendants and appellants
Van Liere & EN–R–G Max.

AMUNDSON, Justice.

[¶ 1] Jim Weins and Mac Meyer (often
collectively referred to as Weins) asserted a
claim for misappropriation of a trade secret
against Robert Sporleder (Sporleder), Merle

Van Liere and En–R–G Max, Inc. (often
collectively referred to as Van Liere), and a
contract action against Sporleder. During
the trial, Weins amended his complaint to
assert various tort claims against Sporleder,
Van Liere, and En–R–G Max, Inc. Each
claim was submitted to the jury. A verdict
was returned in favor of Weins for compen-
satory and punitive damages. The trial
court later found that the tort claims were
displaced by the Uniform Trade Secrets Act
and struck the jury's award of punitive dam-
ages.[1]

[¶ 2] We reverse as to the verdict finding
misappropriation of a trade secret.

## FACTS AND PROCEDURAL HISTORY

[¶ 3] This case involves the development of
livestock feed supplements. Van Liere ini-
tially retailed feed supplements, later built a
feed manufacturing plant and developed a
soybean flaking process. Weins was em-
ployed with a feed company, TCI, which sold
industrial minerals for livestock and liquid
supplements for cattle. During his employ-
ment, he was involved with formulating feed
programs for farmers. Sporleder earned an
associate's degree in applied science in ani-
mal nutrition and soil sciences. He was also
a dealer for TCI for a few years, dealing with
the formulation of feed programs.

[¶ 4] In 1983, Weins was working on a
fermentation idea with yeast and sugar. He
discussed the development of a tub product
using this fermentation idea with Billy Tal-
bot, an employee of TCI. When the plan
never advanced beyond these general discus-
sions, Weins began working with another
company in similar employment where he
also discussed the production of the tub
product with other parties. In 1985, he ter-
minated this employment and moved to Rap-
id City. Weins then spoke to Frank Parker
about retailing and/or manufacturing a tub
product, but Parker chose to remain unin-
volved. In 1987, Weins first mentioned his

1. This cause of action was consolidated for trial
with *Sporleder v. Van Liere & En–R–G Max, Inc.,*

1997 SD 110, 569 N.W.2d 8 (1997) in which

idea to Meyer.[2]  He also contacted Western Ranch Products regarding the manufacture of his product.

[¶ 5] In September of 1988, Weins and Sporleder first met and discussed experimentations with feed products.  Within a month, Weins, Meyer, and Sporleder were mixing a batch of feed in a garage.  The ingredients included milo flour, En–R–G Flakes, cane molasses, sugar, urea, ethyl alcohol, enzyme and fermentation packages, metal proteinates, vitamins, and iodine.  Weins incorporated his fermentation idea by adding sugar and alcohol as limiting agents in initial batches of feed.  The test results indicated lack of consistency, as the cattle ate more than a desirable amount.

[¶ 6] Other limiting agents were used unsuccessfully until Sporleder suggested the use of phosphoric acid.[3]  He acquired the idea from Phil Anderson, who patented a liquid feed product in the 1950's that contained alcohol and phosphoric acid.[4]  The use of phosphoric acid as a limiter was also discussed with Robert Riser.  The precise results of the phosphoric acid combined in this product were unclear.  Initial testing of the product indicated success, but Weins continued to test and perfect it.[5]

[¶ 7] Sporleder, Weins, and Meyer then agreed that Sporleder would set up a corporation named "Pro–Energy" and Weins and Meyer would arrange for a patent search.  Weins relayed to Sporleder his lawyer's advice that they could not sell the product until they applied for a patent.  Apparently, Sporleder was dissatisfied with the delay and contacted another lawyer recommended by Van Liere.  Meanwhile, Weins and Meyer decided to abandon the name "Pro–Energy"

and use "Ferm–Mix."  Thus, Pro–Energy was never incorporated.  By March of 1989, Weins and Meyer terminated their relationship with Sporleder.  When they applied for a patent, Weins and Meyer were forced to exclude phosphoric acid from their formula since the idea was Sporleder's.[6]  The patent application was eventually rejected due to prior art, general knowledge, and ordinary skill in the industry.

[¶ 8] Shortly thereafter, Sporleder approached Van Liere with a proposed tub product.  Sporleder claims the product was not the same as Weins', because Weins admittedly used fermentation yeast and sugar, while Sporleder used phosphoric acid.  Sporleder and Mark VanderVliet tested the product at several farms, but consistency was never achieved.

[¶ 9] A series of letters and phone calls between the lawyers, Weins, Meyer, Sporleder, and Van Liere ensued.  Among them was an alleged call in March of 1989 between Meyer and Van Liere, in which Meyer told Van Liere and Sporleder to discontinue making their tub product.  Van Liere claims he was not making a tub product at that time.  Rather, he contends that he was dealing with Sporleder concerning other matters.[7]

[¶ 10] Van Liere claims he began manufacturing his own product in May of 1989, using steam-flaked corn, En–R–G Flakes, and base-mixes, along with molasses and phosphoric acid.  Testing of the product was conducted and, by August of 1989, there was a marketable product.

[¶ 11] On August 26, 1991, the first complaint was filed by Sporleder against Van Liere and En–R–G Max, Inc., claiming unjust enrichment, breach of fiduciary duty,

---

*Sporleder* claimed implied contract, unjust enrichment, breach of fiduciary duty, and fraud.

2.  Meyer, the owner of a trucking business, met Weins through a mutual friend.  The two then discussed feed sales and began working together.

3.  Limiting agents such as phosphoric acid are used to prevent cattle from overeating.

4.  This patent was later held invalid due to its obviousness.  *Rawlings v. National Molasses Co.,* 328 F.Supp. 913, 920 (C.D.Cal.1971).

5.  Such testing was performed on different ranches.  Whether the owners of the ranch were informed of the formula for the ingredients in the tub is in dispute.

6.  Phosphoric acid was, however, used in Weins' final product.  *See, e.g.,* ¶ 21, *infra.*

7.  Sporleder started a feed company, Winner Circle Feeds (WCF), which was having financial difficulties.  Therefore, Van Liere eventually agreed to sell directly to some of WCF's customers in April of 1989.

fraud and deceit, and an implied contract claim, all arising from an alleged joint venture. A month later, on September 26, 1991, Weins and Meyer asserted a claim for violation of a trade secret law against Van Liere and En–R–G Max, Inc., as well as a contract action against Sporleder. Weins and Meyer claim the concept they developed of putting a feed supplement in a tub was a trade secret, and that Sporleder, Van Liere, and En–R–G Max, Inc. misappropriated it. All of the aforementioned causes of action were consolidated for trial.

[¶ 12] The trial court initially directed a verdict against Sporleder on his implied contract claim and, during the trial, Weins and Meyer were allowed to amend their complaint to assert various tort claims. After a twelve-day trial, the trial court submitted the remaining claims to the jury. As to Sporleder's causes of action, the jury returned a verdict in favor of Sporleder for $320,000 in compensatory damages and $100,000 in punitive damages against Van Liere and En–R–G Max, Inc. Judgment was entered for $420,000.

[¶ 13] As for the remaining causes of action, the jury returned a verdict in favor of Weins and Meyer for $440,000 against Sporleder (50%), Van Liere (25%), and En–R–G Max, Inc. (25%), plus punitive damages of $100,000, $50,000, and $50,000, respectively. The trial court later found that the tort claims (including the claim for punitive damages) were displaced by South Dakota's adoption of the Uniform Trade Secrets Act and struck the jury's award of punitive damages. Judgment was entered for $440,000.

[¶ 14] Van Liere appeals, raising the following issues:

I. Whether the Weins verdict is inconsistent.

II. Whether Weins has a trade secret as a matter of law, or in the alternative, whether there is sufficient evidence of a trade secret.

III. Whether there is sufficient evidence of misappropriation.

IV. Whether the trial court improperly instructed the jury.

V. Whether the trial court made proper evidentiary rulings.

VI. Whether the damages awarded by the jury are supported by the evidence, are contrary to law, or are the result of passion and prejudice.

VII. Whether there was misconduct by counsel for Weins during the trial which requires a new trial.

VIII. Whether Weins should have been allowed to file a second amended compliant during the trial.

IX. Whether the costs should be reversed.

Sporleder also appeals as to the jury verdict against him, raising one issue different from Van Liere:

I. Whether the joint venture was terminated.

Weins and Meyer collectively filed notice of review, raising the following issues:

I. Whether the trial court erred in striking the punitive damages awarded by the jury.

II. Whether Weins is entitled to prejudgment interest on the compensatory damages awarded by the jury.

III. Whether punitive damages and attorney's fees should have been awarded on the first cause of action, misappropriation of a trade secret.

## DECISION

[¶ 15] Sporleder and Van Liere contend the trial court erred in failing to grant a summary judgment, directed verdict, or judgment notwithstanding the verdict on the issue of misappropriation of a trade secret. The standard of review in such instances was identified in *Olson v. Judd,* 534 N.W.2d 850, 852 (S.D.1995). Since a trial court's decision regarding a motion for directed verdict is similar to judgment notwithstanding the verdict, these motions are considered together. *Id.* Evidence is viewed in a light most favorable to the nonmoving party and, if there is "substantial evidence to sustain the cause of action[,]" it is inappropriate to grant a directed verdict or a judgment notwithstanding the verdict. *Id.* (quoting *Weiszhaar Farms, Inc. v. Tobin,* 522 N.W.2d 484 (S.D.1994)). As to

the review of a trial court's decision regarding summary judgment, we look for any basis which supports the trial court's ruling. *Easson v. Wagner,* 501 N.W.2d 348, 350 (S.D. 1993) (quoting *Waddell v. Dewey County Bank,* 471 N.W.2d 591, 593 (S.D.1991)).

■■■ [¶ 16] Van Liere and Sporleder claim Weins had no trade secret as a matter of law. The determination as to whether a trade secret exists as a matter of law is of first impression in this Court. We agree with the standard of review applied in a similar case, *Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405, 1427 (N.D.Iowa 1996) (interpreting Iowa law). The court concluded the existence of a trade secret is a mixed question of law and fact. "The 'legal part of the question' is whether the information in question 'could constitute a trade secret under the first part of the definition of trade secret....'" *Id.* (quoting *Economy Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641, 648 (Iowa 1995)). We review such questions of law de novo. *Grode v. Grode,* 1996 SD 15, ¶ 5, 543 N.W.2d 795, 799. "The 'fact part of the question,' on the other hand, arises from the remaining part of the statutory definition found in subdivisions [of the statute]." *Uncle B's Bakery, Inc.,* 920 F.Supp. at 1427 (quoting *Economy Roofing,* 538 N.W.2d at 648). Questions of fact are reviewed applying a clearly erroneous standard. *Grode,* 1996 SD 15, at ¶ 5, 543 N.W.2d at 799.

[¶ 17] The question of law pertains to SDCL 37–29–1(4), defining trade secret as "information, including a formula, pattern, compilation, program, device, method, technique or process," whereas the questions of fact involve the remaining subsections which require that the trade secret:

(i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[8]

■■ [¶ 18] The burden is upon Weins to show the existence of a trade secret. *Jensen v. Redevelopment Agency of Sandy City,* 998 F.2d 1550, 1556 (10th Cir.1993); *Mid–America Mtg. Corp. v. Dakota Indus.,* 281 N.W.2d 419, 422 (S.D.1979), *reh'g granted,* 289 N.W.2d 797 (S.D.1980) (the first opinion was decided before the adoption of SDCL ch 37–29). Throughout the proceedings, however, there was never a clear assertion as to what exactly was claimed to be the trade secret. Weins' complaint initially refers to the "feed product, and its use and application" as the trade secret. Later in the complaint, Weins states that the "selling and developing of the feed product" is the trade secret. In Weins' amended complaint, there is reference to an "idea," an "invention," a "tub feed product containing a combination of ingredients to be fed free choice," and "selling and developing the feed product" as the trade secret. The second amended complaint refers to the trade secret as a "feeding system." During the trial, Meyer testified the trade secret was the formula alone, while Weins testified the trade secret was not the formula, but the idea of combining ingredients into a tub. In addition, Weins' briefs submitted to this Court fail to assert what exactly constitutes the trade secret.

[¶ 19] In a similar case, wherein there was confusion as to what the trade secret was claimed to be, the Eighth Circuit Court of Appeals stated: "The testimony on this count was somewhat confused as Coenco never quite specified what 'trade secrets' had been taken from it. The theory seems to have been that the defendants had stolen [the plaintiff's] ideas as represented by the [product]." *Coenco, Inc. v. Coenco Sales, Inc.,* 940 F.2d 1176, 1178–79 (8th Cir.1991). Ultimately, a judgment notwithstanding the verdict was held to be proper on the grounds that "the evidence failed, as a matter of law, to prompt application of the [trade secrets act]." *Id.* at 1179. Likewise, Weins cannot clearly demonstrate his position on what constitutes the trade secret.

■ [¶ 20] Even if Weins' product was considered a trade secret under the initial

8. SDCL ch 37–29 is a substantial adoption of the    Uniform Trade Secrets Act.

requirement stated in SDCL 37–29–1(4), it fails under subsections (i) and (ii) for lack of sufficient evidence. The first subsection states there must be economic value which is not readily ascertainable by other means. SDCL 37–29–1(4)(i). As stated by the Seventh Circuit Court of Appeals, "[t]his requirement precludes trade secret protection for information generally known within an industry even if not to the public at large." *Mangren Research & Dev. v. National Chem. Co.*, 87 F.3d 937, 942 (7th Cir.1996).

■ [¶ 21] It is undisputed that Weins' product is a combination of well-known feed materials provided as a feed supplement. Specifically, the contents of the end product include milo flour, soybean flakes, cane molasses, sugar, urea, phosphoric acid, ethyl alcohol, an enzyme and fermentation package, metal proteinates (trace metals), and various vitamins. Combining these materials cannot be considered a trade secret if the formula was " 'within the realm of general skills and knowledge' in the relevant industry." *Computer Care v. Service Sys. Enters., Inc.*, 982 F.2d 1063, 1072 (7th Cir.1992) (quoting *Service Ctrs. of Chicago, Inc. v. Minogue*, 180 Ill.App.3d 447, 129 Ill.Dec. 367, 371, 535 N.E.2d 1132, 1136 (1989)); *see also Nickelson v. General Motors Corp.*, 361 F.2d 196, 199 (7th Cir.1966) (holding that since the process of chrome-plating was commonly known and used in the industry, there was no trade secret) (applying tort law before the enactment of the Uniform Trade Secret Act). Thus, the focus turns to the " 'ease with which information can be developed through other proper means: if the information can be readily duplicated without involving considerable time, effort or expense, then it is not secret.' " *Computer Care*, 982 F.2d at 1072 (quoting *Hamer Holding Group, Inc. v. Elmore*, 202 Ill.App.3d 994, 148 Ill.Dec. 310, 311, 560 N.E.2d 907, 908 (1990)); *see also Coenco, Inc.*, 940 F.2d at 1179 (noting testimony revealed the product was "readily ascertainable by proper means").

[¶ 22] The ease with which one can develop a similar product is examined by focusing on the time and expense involved. *See Computer Care*, 982 F.2d at 1072; *Pioneer Hi–Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1236 (8th Cir.1994) (quoting Peter J. Courture, "Independent Derivation and Reverse Engineering," in *Trade Secret Protection and Litigation: Protecting Confidential Business and Technical Information* 623 (PLI Patents, Copyrights, Trademarks & Literary Property Course Handbook Series No. 340, 1992)). An expert testified as to the ease of determining the contents of a feed product. By microscopy, the formula of a feed product can be established in twenty minutes. Further testimony revealed that a chemical analysis would take at most four or five days, costing around $27. This testimony clearly demonstrates the ease of duplicating Weins' formula. *See, e.g., Computer Care*, 982 F.2d at 1075 (stating, "Computer Care's system is readily replicable by anyone who has been exposed to its various components; one need not also have knowledge of a special formula or technique for combining those components.").

[¶ 23] Furthermore, reasonable minds could not have differed as to the determination of whether the economic value of Weins' product was readily ascertainable by other means. *See id.;* SDCL 37–29–1(4)(i). Weins offered no evidence that the use of phosphoric acid to limit consumption in feed products was not readily ascertainable by other persons. In fact, Phil Anderson was granted a patent along with Frank N. Rawlings on a feed supplement containing molasses, urea, and phosphoric acid for use as a liquid, free-choice feed supplement for ruminants.[9] In other words, the product used phosphoric acid as a consumption limiter, similar to Weins' final product.

[¶ 24] In addition, Weins actually admitted that the ingredients in his product were readily available in the market, and that it was common knowledge in the feed industry that these kinds of ingredients are used to formulate feed supplements.[10] We are re-

---

**9.** As we noted in footnote 3, this patent was challenged in Rawlings, wherein the court held the patent was invalid because prior art disclosed its obviousness. 328 F.Supp. at 920.

**10.** Weins testified as follows:
Counsel: The ingredients that you used in your recipe, were those ingredients that were available on the market?

minded that one cannot claim a better version of the facts than prior testimony demonstrates. *Parkhurst v. Burkel*, 1996 SD 19, ¶ 19, 544 N.W.2d 210, 214 (1996). Basically, Weins agreed with the opinion of the patent examiner who rejected Weins' patent claim on the product because his "composition is merely a combination of well-known feed materials provided as a feed supplement for their known and expected functions." Weins' patent application was ultimately denied by the United States Patent Office based upon obviousness, reinforcing the determination that Weins' product is not a trade secret as a matter of law. *See R & R Plastics, Inc. v. F.E. Myers Co.*, 92 Ohio App.3d 789, 637 N.E.2d 332, 340 (1993) (stating the obvious nature of a product was relevant when determining whether it was a trade secret).[11]

[¶ 25] Facts similar to this case, which assist with the determination of the existence of a trade secret as a matter of law, are found in *TGC Corp. v. HTM Sports, B.V.*, 896 F.Supp. 751, 753 (E.D.Tenn.1995), wherein a jury returned a verdict in favor of a glove manufacturer (TGC) on its trade secret misappropriation claim. The defendant, a corporation which agreed to market the gloves (HTM), then made a motion for judgment as a matter of law, claiming the evidence did not support the jury's determination. The District Court in Tennessee agreed, holding there was no trade secret as a matter of law. *Id.* at 763.[12] Although TGC contended a certain feature of the glove, the seamless palm, was a trade secret, the court held that because the idea of a seamless palm was public knowledge, it cannot be a trade se-

cret.[13] TGC further argued that a trade secret existed because it was the first to use the seamless palm design in a golf glove or a racquetball glove. *Id.* at 757. The court responded by stating: " 'Simply being the first or only one to use certain information does not in and of itself transform otherwise general knowledge into a trade secret.' " *Id.* (quoting *Computer Care*, 982 F.2d at 1073 (quoting *Service Centers of Chicago, Inc.*, 129 Ill.Dec. 367 at 371, 535 N.E.2d at 1136)). TGC also maintained that the way in which the seamless palm was manufactured (counterstretching) was a trade secret. *Id.* at 758. The court held that counterstretching was a conclusion to be easily drawn, lacked novelty, was generally known in the trade, was used by others, and was "easily ascertained or duplicated." *Id.* at 758–59.

[¶ 26] Similarly, as we noted previously, although the feed product is claimed by Weins to be a trade secret, all of the ingredients therein are public knowledge. Furthermore, being the first to combine the ingredients is of no assistance to the claim of trade secret. Weins also claims the process used to combine the ingredients was the trade secret, but such a combination is easily duplicated, thereby preventing it from being a trade secret.

[¶ 27] In addition, there was no substantial evidence showing Weins took reasonable efforts to maintain his product's secrecy. SDCL 37-29-1(4)(ii). Secrecy is fundamental to the existence of a trade secret. *Pioneer Hi-Bred Int'l*, 35 F.3d at 1235. Although the secrecy is not required to be absolute, reasonable precautions must be

---

Weins: Yes, they were.
Counsel: All right. Could you buy them—Anybody could go buy them; right?
Weins: Yes.
Counsel: And isn't it common knowledge in the feed industry that these kind of ingredients are used to formulate feed supplements?
Weins: That is common knowledge, with the understanding, the right combination of ingredients will make feed much better.

11. However, the jury in the case at hand was instructed to disregard the patent exhibits when determining whether a trade secret exists.

12. For a review of case law dealing with the determination of trade secret as a matter of law,

see *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1549–50 (11th Cir.1996) (holding it was error to grant a directed verdict and/or judgment notwithstanding the verdict because there was insufficient evidence to prove the existence of an implied confidential relationship, which was the sole basis for the trade secret misappropriation claim); *Bridge Publications, Inc. v. Vien*, 827 F.Supp. 629, 632–34 (S.D.Cal.1993) (affirming a summary judgment in favor of the plaintiff because no factual dispute existed regarding secrecy of materials or economic value thereof).

13. A glove with a seamless palm is comprised of "a pattern of five pieces sewn together with a 'gunn cut' and with single seams around the fingers." *Id.* at 757.

taken. *Id.* Regarding such precautions, the Appellate Court of Illinois held:

> [N]o evidence exists to show that plaintiff took any affirmative measures to keep its [product] secret. No evidence was presented regarding internal or external physical security; that confidentiality agreements or understanding existed among those having access to plaintiff's [product]; that plaintiff's [product] contained confidentiality stamps or [was] kept under lock and key; or that employees received entrance and exit interviews imparting the importance of confidentiality. Consequently, we conclude that plaintiff failed to produce sufficient evidence to prove that under [the relevant section] of the [Trade Secrets] Act, its [product] was the subject of reasonable efforts designed to protect its secrecy.

*Gillis Associated Indus. v. Cari–All,* 206 Ill. App.3d 184, 151 Ill.Dec. 426, 431, 564 N.E.2d 881, 886 (1990) (applying the same subsection as SDCL 37–29–1(4)(ii)).

[¶ 28] Again, the application of *TGC* is helpful. The sizing specifications of the gloves in *TGC* were claimed to be a trade secret, but the court found the size of a glove can be duplicated by merely viewing it, and "[m]atters disclosed by a marketable product cannot be a secret." 896 F.Supp. at 760. Likewise, in the present case, the idea of putting the feed in a tub cannot be considered a trade secret since the tub is viewable. In addition, feed supplements were placed in similar containers before the idea of using tubs. Among a few other remaining claims concerning the existence of a trade secret in *TGC* was the combination of the components. *Id.* at 760. Responding to this claim, the court stated,

> [T]he clear weight of the evidence is that TGC did not have confidential agreements.... Yet, TGC gave both those firms the necessary information with which to make the TGC glove. The voluntary disclosure of "any alleged 'trade secret' as part of a business transaction without any reservation or agreement of confidentiality prevents recognition of the information as a 'trade secret.' "

*Id.* at 760–61 (quoting *Turner v. Great Am. Opportunities, Inc.,* 716 S.W.2d 40, 44 (Tenn. Ct.App.1986)). Similarly, Weins fails to demonstrate active measures were taken to maintain his product's secrecy. For example, Weins and Meyer discussed manufacturing and marketing the product with persons from other companies. They admit that numerous people were aware of the product, yet no confidentiality agreements were signed. Tubs were left in areas making them visible to others, and they tested their product on many different ranches. While Weins lists persons who allegedly were not informed of the formula, he fails to dispute the aforementioned incidences demonstrating the lack of secrecy. A few instances of nondisclosure of the alleged secret do not amount to "reasonable efforts" to maintain secrecy. *See Nordale, Inc. v. Samsco, Inc.,* 830 F.Supp. 1263, 1274 (D.Minn.1993) (holding summary judgment was proper because plaintiff failed to demonstrate an intention to keep the information secret, i.e., there was no notice to others regarding confidentiality). Furthermore, although confidentiality agreements are not always necessary, there must be other precautions. *Swift Bros. v. Swift & Sons, Inc.,* 921 F.Supp. 267, 277 (E.D.Pa. 1995). There were no such precautions constituting "reasonable efforts" in this case.

[¶ 29] Viewing the evidence most favorably to Weins, we conclude that no substantial evidence exists which demonstrates Weins' product possesses economic value not readily ascertainable by other means pursuant to SDCL 37–29–1(4)(i), or that Weins maintained the product's secrecy according to SDCL 37–29–1(4)(ii). Therefore, the trial court erred when it denied the motions for directed verdict and/or judgment notwithstanding the verdict.

[¶ 30] Even if a trade secret was involved in this case, there was no misappropriation. Misappropriation means:

(i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(ii) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Used improper means to acquire knowledge of the trade secret; or

(B) At the time of disclosure or use, knew or had reason to know that such knowledge of the trade secret was:

(I) Derived from or through a person who had utilized improper means to acquire it;

(II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use[.]

SDCL 37–29–1(2). Weins and Meyer have the burden of proving Sporleder and Van Liere misappropriated the trade secret pursuant to this statute. Such a burden includes proving there was an improper acquisition of the so-called formula. "Improper" is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]" SDCL 37–29–1(1). Weins and Meyer cannot prove such improper acquisition, since the kind of ingredients used in their product to formulate feed supplements are of common knowledge even by Weins' own admission. As stated in *Computer Care*, a protectable trade secret cannot be established when a formula is easily duplicated using commonly known ingredients. 982 F.2d at 1075; *see also American Antenna Corp. v. Amperex Elec. Corp.*, 190 Ill. App.3d 535, 137 Ill.Dec. 417, 420, 546 N.E.2d 41, 44 (1989) (holding there was no trade secret misappropriation as a matter of law when no improper acquisition could be shown).

[¶ 31] Furthermore, Weins has not shown that Van Liere and Sporleder actually used the formula. No evidence exists proving the product ultimately mixed by Van Liere and Sporleder was *exactly* the same as Weins' product. In fact, Weins admitted the products were not the same during his testimony. Weins' product includes sugar, yeast, and alcohol, making it a sweet, fermentation product, while Van Liere's product is a natural, texturized product. Van Liere's expert testified the products are considerably differ-

ent. Although Weins' expert stated the products were substantially similar, he never actually examined the formula. Since Van Liere and Sporleder's end product was at least somewhat different from Weins' product, it is clear that independent thought was used to obtain the result. *See, e.g., TGC*, 896 F.Supp. at 761 (stating that since the end product was different than the original design, there was no indication that the trade secret was even used). Certainly Van Liere and Sporleder cannot be prevented from applying their independent ideas and knowledge in the industry.

[¶ 32] Due to our holding on the trade secret issue, we need not address the remaining issues in this case. We reverse and direct a judgment consistent with this opinion.

[¶ 33] MILLER, C.J., and KONENKAMP and GILBERTSON, JJ., concur.

[¶ 34] SABERS, J., dissents.

SABERS, Justice (dissenting).

**THERE IS SUBSTANTIAL EVIDENCE TO SUPPORT THE JURY'S CONCLUSION THAT THE FORMULA CONSTITUTED A TRADE SECRET.**

[¶ 35] The Uniform Trade Secret Act (UTSA) is codified at SDCL ch 37–29. Whether something is a "trade secret" hinges on SDCL 37–29–1(4), which provides:

(4) "Trade secret," [is defined as] information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

As noted by the majority opinion, this statute requires a two-part analysis, one legal and one factual.

[¶ 36] The legal question, whether the information in question constitutes a trade secret as "a formula, pattern, compilation, program, device, method, technique or process," presents a question of law for the trial court. *See Economy Roofing & Insulating v. Zumaris,* 538 N.W.2d 641, 648 (Iowa 1995); *see also US West Communications v. Office of Consumer Advocate,* 498 N.W.2d 711, 714 (Iowa 1993):

> Trade secrets can range from customer information, to financial information, to *information about manufacturing processes to the composition of products.* There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret.

(Quoting Thomas J. Collin, *Determining Whether Information is a Trade Secret Under Ohio Law,* 19 UTolLRev 543, 545 (1988)) (emphasis added). The majority opinion concludes, as a matter of law, that no trade secret existed because "there was never a clear assertion as to what exactly was claimed to be the trade secret." *Supra* ¶ 18.[14] On the contrary, it is obvious that the product at issue is a certain livestock feed mixture. For example, Weins asserted in his brief that the product in question was

> a feed that could be used anywhere, (not subject to freezing like the Anderson product), that took advantage of the fermenting process using a yeast and sugar process and that would be self limiting. [Unlike Anderson's product,] Weins, Meyer and Sporleder developed a dry product.

[¶ 37] The fact part of the question arises from the remaining portion of the definition in subdivisions (i) and (ii). *Economy Roofing,* 538 N.W.2d at 648–49 (construing identical statute); *see also Gold Messenger, Inc. v. McGuay,* 937 P.2d 907, 911 (Colo.Ct.App. 1997) ("What constitutes a trade secret is a question of fact[.]") (citation omitted). I submit that the majority opinion is relitigating facts which were properly presented to and decided by the jury.

We interpret the facts on a basis most favorable to upholding the jury's verdict.

Our standard of review of the circuit court's denial of a directed verdict and of the jury's determination in favor of [the] plaintiff is well established. We must examine the evidence in the light most favorable to the non-moving party and give [her] the benefit of all reasonable inferences. *Robinson v. Mudlin,* 273 N.W.2d 753, 755 (S.D.1979). The moving party is entitled to evidentiary consideration *only where its evidence is uncontradicted or tends to amplify, clarify or explain the evidence in support of the verdict of the jury for the prevailing party.* *Nugent v. Quam,* 82 S.D. 583, 152 N.W.2d 371, 374 (1967).

In such a context, it becomes our task to review the record and determine whether there is any substantial evidence to allow reasonable minds to differ. *Haggar v. Olfert,* 387 N.W.2d 45 (S.D.1986). *This court does not weigh the evidence and substitute its judgment for that of the jury. Robinson, supra; Berg v. Sukup Mfg.,* 355 N.W.2d 833, 835 (S.D. 1984).

*Landstrom v. Shaver,* 1997 SD 25, ¶ 72, 561 N.W.2d 1, 16 (quoting *Westover v. East River Elec. Power Coop.,* 488 N.W.2d 892, 896 (S.D. 1992)) (emphasis added); "This court does not decide factual issues de novo." *In re A.R.P.,* 519 N.W.2d 56, 61 (S.D.1994) (citations omitted).

> It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable.

*Fajardo v. Cammack,* 322 N.W.2d 873, 878 (S.D.1982) (Wollman, C.J., concurring specially) (citations omitted); *see also Overholt Crop Ins. Serv. Co. v. Travis,* 941 F.2d 1361,

---

**14.** The majority opinion's reliance on *Coenco, Inc. v. Coenco Sales, Inc.,* 940 F.2d 1176 (8th Cir.1991), is misplaced. *Supra* ¶ 19. The *Coenco* court affirmed the grant of judgment notwithstanding the verdict, *not* because plaintiffs did not specify what constituted the "trade secret," but because the plaintiff failed to prove either of the *factual* elements of the statute. *Id.* at 1179.

1369 (8th Cir.1991) (construing SDCL 37–29–1(4) and noting that the *jury* was properly instructed regarding subdivision (ii)).

[¶ 38] The jury was properly instructed regarding trade secrets. Instruction 19 was taken verbatim from SDCL 37–29–1(4), and the jury decided the question based on that instruction.

> Jurors are deemed to be reasonably intelligent. *Allen v. McLain,* 75 S.D. 520, 69 N.W.2d 390 (1955). It is also presumed that a jury understands and follows the court's instructions. *Giltner v. Stark,* 219 N.W.2d 700 (Iowa 1974). In addition, a jury verdict may be read in light of the pleadings in the case, the issues presented by the evidence, and the charge made to the jury. *NEDA Const. Co., Inc. v. Jenkins,* 137 Ga.App. 344, 223 S.E.2d 732 (1976).

*Mid-America Mktg. Corp. v. Dakota Indus., Inc.,* 289 N.W.2d 797, 799 (S.D.1980) (upholding jury verdict which concluded misappropriation of a trade secret occurred).

[¶ 39] The first factual element of the statute requires that the product "[derive] independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use[.]" The majority opinion substitutes its judgment for that of the jury and the trial court and concludes that "reasonable minds could not have differed as to [this] determination." *Supra* ¶ 23. What this statement fails to recognize is that reasonable minds *do* differ

on this issue, i.e., the jury and the judge reached a conclusion with which the majority opinion disagrees.

[¶ 40] The appellants focus on the fact that phosphoric acid was readily known as a potential limiting agent in livestock feed.[15] However, the heart of this issue seems to concern the "Limiter One, Limiter Two, and Limiter Three" use of phosphoric acid in the product.[16] Van Liere testified that his employee formed the idea for a three-stage application of this ingredient, which was incorporated into the En–R–G–Max product. Weins testified that it was his idea. Credibility questions are for the jury. *Fajardo, supra.* Similarly, when expert testimony conflicts, it is up to the jury to determine which testimony to accept. "It is well established ... that the jury is not obligated to accept an expert's opinion and may disregard the testimony if it desires." *Andreson v. Black Hills Power & Light Co.,* 1997 SD 12, ¶ 10, 559 N.W.2d 886, 889 (1997) (citations omitted); *see also LDL Cattle Co., Inc. v. Guetter,* 1996 SD 22, ¶ 22, 544 N.W.2d 523, 528 (1996) (stating that the "purpose of expert testimony is to assist the jury as the trier of fact and not to supplant it.") (citations omitted).

[¶ 41] The second factual element provides that the information must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." The majority opinion states that "Weins fails to demonstrate active measures were taken to maintain his product's secrecy." *Supra* ¶ 28. However, the evidence shows that none of

---

15. *But see Rivendell Forest Prod. v. Georgia–Pacific Corp.,* 824 F.Supp. 961, 967 (D.Colo.1993), *rev'd on other grounds,* 28 F.3d 1042 (10th Cir. 1994), (collecting cases and noting that general, well-known concepts are not protectable as trade secrets, but specific implementation of their combination may be). Additionally, the majority opinion's claim that rejection of the patent application reinforces the determination that Weins' product is not a trade secret (*supra* ¶ 24) is without merit. "[N]ovelty and invention are not requisite for a trade secret as they are for patentability ... The protection is merely against breach of faith and reprehensible means of learning another's secret." *Id.* at 967 (quoting *Kodekey Elec., Inc. v. Mechanex Corp.,* 486 F.2d 449, 455 (10th Cir.1973) (emphasis omitted)).

16. While the majority opinion maintains that the ingredients were readily ascertainable, no proof was offered to show that any other company was utilizing the three-stage process. See, e.g., *Bestechnologies, Inc. v. Trident Envtl. Sys., Inc.,* 681 So.2d 1175, 1176 (Fla.Dist.Ct.App.1996) ("[T]he fact that every competitor had discovered the same process might be relevant to establish that the information was 'generally known' and 'readily ascertainable' to competitors."). Furthermore, Sporleder's expert did not testify that *this* feed product could be analyzed in 20 minutes or five days (*supra* ¶ 22). "The value of an expert's opinion is no better than the facts upon which it is based." *LDL Cattle Co. v. Guetter,* 1996 SD 22, ¶ 22, 544 N.W.2d 523, 528 (1996) (citation omitted).

the people who allowed testing on their livestock were aware of the formula of the feed. Weins may have discussed manufacturing his product with other companies, yet there was no evidence that the formula was divulged during these conversations. In fact, no one testified that Weins or Meyer *ever* disclosed the formula. The jury could reasonably conclude that nondisclosure of the formula during the development and testing stages constituted "efforts that are reasonable under the circumstances to maintain its secrecy," and there is substantial, uncontradicted evidence to support that conclusion.

## THERE IS SUBSTANTIAL EVIDENCE TO SUPPORT THE JURY'S CONCLUSION THAT SPORLEDER MISAPPROPRIATED A TRADE SECRET.

[¶ 42] Whether Sporleder misappropriated Weins' trade secret is governed by SDCL 37–29–1(2), which provides:

(2) "Misappropriation,"

(i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper [17] means; or

(ii) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Used improper means to acquire knowledge of the trade secret; or

(B) At the time of disclosure or use, knew or had reason to know that such knowledge of the trade secret was:

(I) Derived from or through a person who had utilized improper means to acquire it;

(II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) Before a material change of position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake[.]

[¶ 43] Whether Sporleder misappropriated a trade secret depends upon whether he "[acquired it] under circumstances giving rise to a duty to maintain its secrecy or limit its use." *Id.* (2)(ii)(B)(II). The jury indicated on the verdict form that Sporleder breached his fiduciary relationship with Weins. The prefatory note to the UTSA indicates one of its purposes is to provide a single statute of limitations for "violation of fiduciary relationship theories of noncontractual liability utilized at common law." 14 ULA *Uniform Trade Secrets Act* 433, 435 (1990). Fiduciary duties are not inherent in normal arm's-length business relationships. *Ward v. Lange,* 1996 SD 113, ¶ 12, 553 N.W.2d 246, 250 (1996) (citations omitted). However, a fiduciary relationship may be created when two or more parties engage in certain other business alliances. *See, e.g., Case v. Murdock,* 488 N.W.2d 885, 889–90 (S.D.1992) (officers and directors of a corporation owe fiduciary duty to shareholders); *Garrett v. BankWest, Inc.,* 459 N.W.2d 833, 838 (S.D. 1990) (acknowledging there may be circumstances where a banker owes a fiduciary duty to its borrower); *Rosebud Sioux Tribe v. Strain,* 432 N.W.2d 259, 264 (S.D.1988) (attorney-client).[18]

[¶ 44] A fiduciary relationship is created when two or more persons engage in a "joint venture." *See* 48A CJS *Joint Ventures* § 24, at 442–44 (1981):

Generally, the parties to a joint venture stand in a fiduciary relation, each to the other, or in a close relationship of trust and confidence, and are bound by the same standards of good conduct and square dealing as are required between partners.

(Collecting cases). The jury was properly

SDCL 37–29–1(1).

---

17. "Improper" is also defined by UTSA: "Improper," includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means[.]

18. This is not intended as an exhaustive list of the relationships in which fiduciary duties may arise.

instructed [19] regarding joint ventures:

The elements of a joint venture are:

(1) an intent to enter into a joint venture;

(2) an agreement, express or implied, among members of a group;

(3) a common purpose to be carried out by the group;

(4) a joint pecuniary interest in that purpose among the members;

(5) an equal right to a voice in the direction and control of the group; and

(6) a right to share in the profits and a duty to share in any losses.

Instruction 31. As noted, the jury found that Sporleder breached his fiduciary duty to Weins. Our task is simply to determine whether there is substantial evidence to support that conclusion. *Landstrom*, 1997 SD 25 at ¶ 72, 561 N.W.2d at 16.

[¶ 45] Sporleder argues that he could not misappropriate the formula employing phosphoric acid as a limiter because he brought the knowledge of that chemical's usefulness to the joint venture. Furthermore, he argues, he continued to test his product *after* his relationship with Weins ended. Therefore, he claims that he could not misappropriate an idea which was his own. His claim fails for several reasons.

[¶ 46] First, it is undisputed that Sporleder and Weins together developed and tested a livestock feed formula. Along the way, they certainly learned what "worked" as well as what did not. *See Morton v. Rank America, Inc.*, 812 F.Supp. 1062, 1073 (C.D.Cal.1993) ("Certain 'negative' research may also result in the creation of protectable information.") (citing *Courtesy Temp. Serv. v. Camacho*, 222 Cal.App.3d 1278, 272 Cal.Rptr. 352, 358 (1990)); *cf. Uncle B's Bakery, Inc. v. O'Rourke*, 920 F.Supp. 1405, 1435 (N.D.Iowa 1996) (*Uncle B's I*) (enjoining plaintiff's former employee from divulging trade secrets and noting that "if the disclosure allows a competitor to cut corners in the research and development process ... the competitor will attain a competing product that much sooner

... this harm [is] irreparable") (the injunction was continued but modified in *Uncle B's Bakery, Inc. v. O'Rourke*, 938 F.Supp. 1450 (N.D.Iowa 1996) (*Uncle B's II* )). In effect, they became joint owners of the research and the formula. *See Morton*, 812 F.Supp. at 1074:

The Defendants have also failed to cite to any authority indicating that the misappropriation of a trade secret by a joint owner of that trade secret does not constitute the misappropriation of the trade secret "of another." Indeed, [the equivalent of SDCL 37–29–1(2)(ii)(B)(II) ] appears to contemplate exactly this situation.... [I]t is reasonable to conclude that one party's use of the trade secrets that affects the other party's right in the [alleged trade secrets] would constitute the misappropriation of the trade secrets "of another."

*Accord B.F. Gladding & Co. v. Scientific Anglers*, 245 F.2d 722, 729 (6th Cir.1957) (pre-UTSA case) ("Even without any specific mention in the contract joint trade secrets would be protected against unlawful disclosure by one of the parties.").

[¶ 47] Second, the fact that Sporleder and Weins continued to independently test the formula, resulting in variations in the final product is no bar to a misappropriation claim. *See, e.g., Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1244 (Fed.Cir.1989), *cert. denied*, 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989) ("Defendants cannot escape responsibility by showing that they have improved upon or modified the plaintiff's process ... minor variations are to be expected.") (citations omitted); *see also Mangren Research & Dev. Corp. v. National Chem. Co., Inc.*, 87 F.3d 937, 944 (7th Cir.1996) ("[I]f trade secret law were not flexible enough to encompass modified or even new products that are substantially derived from the trade secret of another, the protections that law provides would be hollow indeed."). Subsequent improvements made by either party may constitute distinct trade secrets also protected against misappropriation.

---

**19.** The instruction comports with this court's discussion of joint ventures in *Ethan Dairy Products v. Austin*, 448 N.W.2d 226, 228 (S.D.1989).

[¶ 48] Third, Sporleder's claim that the joint venture ended before he began to market his product is not a defense to misappropriation.

Whether a party to a joint venture has the right to withdraw from it, and what the effect of such withdrawal will be, depends upon the terms of the agreement and upon the circumstances. Generally, *where the purposes of the enterprise have not been fulfilled, no party has the right to withdraw from or abandon it without the consent of coventurers. . . .*

Although dissension may provide a sufficient ground for dissolution of the venture by a decree of a court of equity, *in the absence of such a decree, or of an agreement fixing the time of termination or a voluntary abandonment of the enterprise by one of the parties, the agreement remains in force until its purpose has been accomplished or has become impossible of fulfillment. While the agreement is in force, ordinarily one joint venturer has no right to exclude another, or to withdraw himself from he arrangement, in order to act independently in respect to the subject matter. If he does so and thereafter pursues the enterprise alone, he may be compelled to share the benefits with his former associates.*

46 AmJur2d *Joint Ventures* § 31, at 59–60 (1994) (collecting cases) (emphasis added). Therefore, Sporleder's claims and defenses are without merit and the jury properly rejected them.

[¶ 49] There is substantial evidence in the record to support the jury's conclusion that Sporleder misappropriated a trade secret.

[¶ 50] In view of all of the above, I would affirm these two issues and reach the rest of the issues set forth in ¶ 14 of the majority opinion.